1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT
                                    WESTERN DISTRICT OF WASHINGTON
9                                              AT TACOMA

10   DR. TREVOR ALLEN and LISA ALLEN,
     husband and wife, individually and as the
11   natural parents and guardians of AA, CA, and        Case No.  C05-5502KLS
     SA, minor children,
12                                                        ORDER GRANTING
                                                          DEFENDANTS' MOTION FOR
13                  Plaintiffs,                           SUMMARY JUDGMENT ON
                                                          PLAINTIFFS' § 1983 CLAIMS
14            v.

15   THE STATE OF WASHINGTON, SHELLEY
     FELD, JEFFREY S. FRICE, and ANTHONY
16   T. SHAVER, natural persons in their
     individual and official capacity as employees
17   of the State of Washington, and John and Jane
     Does 1 through 25, in their individual and
18   official capacities as unidentified employees of
     the State of Washington,
19
                    Defendants.
20

21

22          This matter comes before the Court on defendants' motion for summary judgment on the federal

23   claims brought by plaintiffs pursuant to 42 U.S.C. § 1983 in their first amended complaint. (Dkt. #30).  The

24   parties have consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28

25   U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Magistrates Rule 13.    Having reviewed

26   defendants' motion, plaintiffs' response thereto and the remaining record, the Court hereby finds and orders

27   as follows.

28                                 FACTUAL AND PROCEDURAL BACKGROUND

            This case involves a complaint alleging a violation of civil rights brought pursuant to 42 U.S.C. §

1983, and certain state tort law claims, including the torts of outrage and negligent and intentional infliction of emotional distress. Plaintiffs' First Amended Complaint, pp. 2-4 (Dkt. #29).

A.  Mr. Allen's Conviction and Sentence

Plaintiff, Trevor Allen, was found guilty of the crime of voyeurism in the Superior Court of the State of Washington, County of Clark, on August 11, 2000. Declaration of Shelley Feld ("Feld Declaration"), Exhibit A.  According to the State of Washington Department of Corrections ("DOC") pre-sentence investigation report, in late January, 2000, Mr. Allen entered a neighbor's yard, went to what he "assumed was the bathroom window" in the "'hopes of seeing something,'" "looked through the window," and "observed a woman in a robe who appeared to be getting ready." Id., Exhibit D.  Mr. Allen also apparently "related he had done this [sort of thing at that house] no more than two times before." Id.

Mr. Allen was sentenced to a total of 107 days in custodial confinement, with credit received for 103 days of home confinement, 400 hours of community service, and 36 months of community supervision. Feld Declaration, ¶ 6 and Exhibit C.  The community supervision portion of his sentence began on November 25, 2000, and included the following conditions: (a) that he "not commit any like offenses"; (b) that he "not possess or use any pornographic material or equipment of any kind," and "not frequent establishments that provide such materials for view or sale"; and (c) at least twice a year he submit to polygraph examinations at the request of his community corrections officer ("CCO") and/or the prosecuting attorney. Feld Declaration, ¶ 6 and Exhibits A and C.  The purpose of the polygraph examinations were to ensure compliance with the conditions of Mr. Allen's community supervision, and the results thereof could then be used by the state in any community supervision revocation hearings. Id.

B.  Mr. Allen's Polygraph Examination

Mr. Allen underwent a polygraph examination performed by Ron W. Yunck on October 8, 2003. Id., Exhibit F.  During a "pre-test interview" conducted prior to the actual examination, Mr. Allen advised Mr. Yunck of the following:

I did the following things wrong when I was at the above residence(s):

Looked at pornography on the computer – last time = 1 month ago – I was alone at the time – looking at still pictures of naked adult females showing their breasts – before I saw this on the computer I had seen an advertisement on the side of a truck (weightless sex.com) and I was curious – then when I got home I got on the computer and looked it up – once I got into the site I entered two pages – I was on the site one minute – I did not masturbate and not have sexual contact with anyone at the time and not shortly

1   afterwards – this is the only time I have looked at pornography on my home computer[.]

2   Peeped on my neighbor Suzie - Age 40s – last time = July or August 2003 – I was alone
    at the time – I was in the upstairs part of my house – peeping through her bedroom
3   window – this was daylight – I saw her in her pajamas – this was in the morning and she
    was reading the newspaper – her pajamas were more like a long shirt and shorts – I
4   peeped on her for about 2 minutes – I was dressed at the time – I did not expose to her,
    not try to and not think about it – I did not masturbate and not have sexual contact with
5   anyone at the time and not shortly afterwards – this was the only time I have peeped on
    her and the only time I have attempted to peep on her – I have not peeped and not
6   attempted to peep on any other neighbor – to me it was not a peeping experience to me –
    I realized where my mind was going and I got away before it becaming [sic] a peeping
7   experience[.]

8   Id., question #002.

9       Mr. Yunck reported that when later questioned during the pre-test interview as to whether he had

10  looked at anything on or from a computer that was sexual, had attempted to deliberately peep on anyone, or

11  had peeped on anyone through a window, crack of the door, hole in the wall or while pretending to sleep,

12  Mr. Allen gave the following answers: "yes" and "refer [sic] prior questions." Id., question #020, #029-

13  #030.  When asked whether he had deliberately disobeyed his probation officer or therapist and committed

14  probation or therapy violations, furthermore, Mr. Yunck reported Mr. Allen stated as follows:

15      Refer [sic] prior questions &

16      Scan TV for the sexual things – last time = 1 week ago – I was at home – I was alone at
        the time – I did not find anything sexual to me and I have scanned 3-4 times total since
17      my last test scanning for sexual things but did not find anything sexual[.]

18  Id., question #006.  In addition, at the end of the pre-test interview, Mr. Yunck reported that in answer to

19  the question as to what was the most serious thing he had done, Mr. Allen stated: "looking at the

20  pornography site on the internet." Id., question #061.

21      On the other hand, Mr. Yunck reported that Mr. Allen answered "no" to the question as to whether

22  he had reported everything to his counselor or probation officer, explaining as follows: "I did not tell them

23  about peeping on my neighbor – the real reason why I did not tell them about this === I did not think it was

24  peeping." Id., question #54.  Mr. Yunck further reported that when asked what he had been "seriously

25  tempted" to, but did not, do, Mr. Allen replied: "scan for sexual things on the computer." Id., question #56.

26  Mr. Yunck also reported that Mr. Allen answered "no" when asked whether he deliberately broke the law or

27  did anything else when he knew it was wrong to do so. Id., question #007-#008.

28      On the polygraph examination itself, Mr. Allen once more answered "no" to the following

    questions: (1) "Since your last test, have you had sexual contact with a minor child?"; (2) "Since your last

ORDER
Page - 3

test, have you deliberately peeped on anyone else?"; and (3) "Since your last test, have you been involved in any other illegal sexual activity?" Feld Declaration, Exhibit F.  Mr. Yunck, again opined that, "[b]ased on the psychological responses" produced during the polygraph examination, Mr. Allen was not "attempting deception" in his answers to the above three questions. Id.

          C.       Disputed Facts Regarding the Polygraph Examination

        In his declaration, Mr. Allen states that during the October 8, 2003 polygraph examination, he told Mr. Yunck that "on one occasion while in the upstairs bedroom" of his home, he saw his neighbor "sitting in her backyard reading a newspaper," that she was wearing pajamas which "covered her completely," and that those pajamas "were not revealing or provocative in any way." Declaration of Trevor Allen ("Allen Declaration"), ¶ 9 (Dkt. #37).  Mr. Allen further states that he told Mr. Yunck that he "looked at her for a short period of time," that he could "sense" his "mind was beginning to skip to a dangerous place," and that he thus "quit looking" and "walked away." Id.

        According to Mr. Allen, he "never used the term 'peep' or 'peeping' or 'peeped' while describing this incident to Mr. Yunck." Id., ¶ 10.  He states that at one point during the pre-test interview, he asked Mr. Yunck "to read back" to him "a summary" of the "conversation where he used those terms," and "told him that it was not a 'peeping' incident" and that he "did not agree with the use of those terms." Id.  In his own deposition for this case, Mr. Yunck testified that he could not remember specifically without looking at the polygraph examination report whether Mr. Allen had used those terms. Plaintiffs' Statement of Material Facts ("Plaintiffs' Statement"), Exhibit Q (Dkt. #34).

        With respect to the issue of accessing pornography on his computer, Mr. Allen states that he told Mr. Yunck he "tried to access it," but then he "stopped immediately" when he "realized" he was "crossing over into dangerous and inappropriate conduct." Allen Declaration, ¶ 11.  Mr. Allen further states that he "did not view pornography" on his computer, nor did he tell Mr. Yunck that he had done so. Id., ¶ 13.

        Mr. Allen states that he "did not see Mr. Yunck's transcript of the pretest interview until" after he was arrested for alleged violations of his conditions of community supervision, as set forth below,[1] and that "[t]he only signature" he provided "was before the interview began," which was on a "Statement of Consent" authorizing the release of information contained in his polygraph examination and holding Mr.

---

[1]Mr. Allen does further state, however, that "[o]n the one or two occasions where" Mr. Yunck "went over the transcript with me, I made corrections," but it appeared Mr. Yunck "never made them in the transcript itself." Id., ¶ 14.

Yunck and his company "harmless and free from any liability." Id., ¶ 14; see also Feld Declaration, Exhibit

F.  In his deposition testimony, Mr. Yunck himself confirmed that the above "Statement of Consent" merely

allowed him to give Mr. Allen the polygraph examination and let Mr. Allen know to whom his information

could be released. Plaintiffs' Statement, Exhibit P.

      Mr. Yunck testified that the "Statement of Consent" is presented to the individual being examined

before the actual polygraph examination is administered. Id., ¶ P.  He further testified that the transcript of

the pre-test interview is not reviewed with the individual being examined prior to sending it to the DOC.

Id., ¶ R.  With respect to Mr. Allen's own polygraph examination, Mr. Yunck testified that Mr. Allen's

signing of the "Statement of Consent" did not "in any way" constitute an acknowledgment that Mr. Allen

agreed with "the accuracy of the pretest interview," nor did Mr. Yunck tell anyone at the DOC that Mr.

Allen's signing could be interpreted as such. Id.  Mr. Yunck also testified that he did not provide Mr. Allen

with a copy of the pre-test interview transcript. Id.

      D.    Mr. Allen's Arrest

      In her declaration, defendant Shelley Feld states that she was Mr. Allen's CCO from July 24, 2003,

until December 18, 2003. Feld Declaration, ¶ 7.  She states that so as "to enforce the terms and conditions"

of Mr. Allen's sentence, she "read records in the DOC file," the reports of his counselor, the DOC's pre-

sentence investigation report, and "the polygraph examiner's reports," and "read and became familiar with"

Mr. Allen's "criminal history and supervised him accordingly," and  Id., ¶¶ 7-8.

      Defendant Feld states that on October 13, 2003, she received a copy of Mr. Yunck's October 8,

2003 polygraph examination report. Id., ¶ 9.  She states that the purpose of the pre-test interview questions

posed to Mr. Allen "is to see if the offender discloses conduct that may violate his sentence," which should

then "be provided to the sentencing court." Id., ¶ 10.  She notes that in response to the questions as to

whether he had deliberately disobeyed his probation officer or therapist, had committed probation or

therapy violations, and had attempted to deliberately peep on anyone, Mr. Allen answered as follows: "yes"

and "refer [sic] prior questions." Id., ¶ 11.  In answer to the question as to what was the most serious thing

he had done, she further notes plaintiff responded with: "Looking at the pornography site on the internet."

Id.

      Defendant Feld states that she then conferred with her supervisor, defendant Jeff Frice, on October

17, 2003, a Friday. Id., ¶ 12.  They both concluded that Mr. Allen "had admitted [in his pre-test interview]

that he had engaged in conduct similar to the conduct for which he was sentenced and which violated the

terms and conditions of his sentence," and that those "admissions" had "created a reasonable suspicion"

that he "had violated his sentence." Id., ¶ 12.

　　　In her deposition for this case, defendant Feld testified that she did not personally speak with Mr.

Yunck about Mr. Allen's polygraph examination before going to arrest Mr. Allen. Plaintiffs' Statement,

Exhibit H.  She testified that while she understood there was a difference between a pre-test interview and

the actual polygraph examination itself, she did not know how the process worked, nor had she ever

received any specific training with respect thereto. Id.  Defendant Feld further testified that she "made the

decision to make an arrest," because "it was on a Friday," and because:

> [C]onsidering the violations -- or allegations that were being presented to me through the
> polygraph examination, I felt that he needed to be taken into custody immediately for
> community safety to avoid any possible -- any future criminal behavior, violation
> behavior.

Id., Exhibit L.

　　　In his declaration, defendant Frice states that Mr. Allen had been classified by the DOC as "a high

risk offender, the second most likely to reoffend." Declaration of Jeff Frice ("Frice Declaration"), ¶ 3.  He

states that on October 17, 2003, defendant Feld came into his office with Mr. Allen's October 8, 2003

polygraph report. Id., ¶ 6.  As did defendant Feld, defendant Frice states that in that report Mr. Allen

"admitted that he had engaged in conduct that" was "prohibited by his judgment and sentence," and that

"[i]n response to direct questions he admitted that he had deliberately peeped on a neighbor and that he had

used a computer to access online pornography." Id.

　　　Also as did defendant Feld, defendant Frice felt "[t]hese admissions in the October 8 pre-polygraph

interview create[d] a reasonable suspicion that" Mr. Allen "was in violation of his judgment and sentence."

Id., ¶ 7.  In his deposition for this case, however, defendant Frice testified that he based his belief that Mr.

Allen committed a violation of his judgment and sentence both on the statements that were attributed to

him in the pre-test interview report, and on Mr. Allen signing the report "saying that he agreed with what

was in there." Plaintiffs' Statement, Exhibit B.  Defendant Frice further testified that he did not contact Mr.

Allen's therapist or read any of his reports prior to deciding to arrest Mr. Allen. Id., Exhibit F.

　　　As noted above, defendant Feld states in her declaration that because "[i]t was Friday afternoon,"

she and defendant Frice decided Mr. Allen "should be brought into custody and brought before the

sentencing court for a violation hearing." Feld Declaration, ¶ 12.  In his declaration, defendant Frice further

elaborated why he decided Mr. Allen should be taken into custody:

> I determined that Allen should be taken into custody because his answers during the
> polygraph interview led me to believe that he presented a significant risk to public safety.
> I want to prevent new criminal behavior and protect potential victims.  If Allen remained
> at large and committed a new offense, the DOC would be liable for any injury caused by
> Allen from the moment that DOC became aware of his potential to reoffend.  My
> decision to arrest Allen was based on DOC's obligation to protect public safety and
> DOC's duty to present this information to the sentencing court so that the court could
> decide whether to reincarcerate Allen or impose a lesser sanction.

Frice Declaration, ¶ 8.

Defendant Frice also determined that Mr. Allen's computer should be "seized and searched for

evidence of a parole violation," and that he should not be asked to report to DOC voluntarily, because that

"would have given him the opportunity to erase evidence from the computer or conceal the computer." Id.,

¶ 11.  To that end, defendant Frice directed defendant Feld "to write an order for arrest and detention, a

notice of violation, and to take" Mr. Allen "into custody." Id., ¶ 7.  In addition, it was the impression of

defendant Tony Shaver, who, as explained below, participated in the arrest of Mr. Allen, that defendant

Frice "wanted to make sure that this arrest was done," and that "he did not want" defendant Feld "talked out

of it" by Mr. Allen. Plaintiffs' Statement, Exhibit U.

Defendants Feld and Frice "recruited a team of four DOC personnel," including both themselves

and defendant Shaver. Feld Declaration, ¶ 13; Frice Declaration, ¶ 9.  Defendant Feld states that she

contacted the local police department and asked them for assistance. Feld Declaration, ¶ 13.  The four DOC

personnel, along with three local police officers who had "joined the arrest team," then drove to Mr. Allen's

house. Id.  According to defendants Feld and Frice, "[i]t is standard operating procedure to take more than

one [DOC] officer to arrest an offender in the community," and to "ask for assistance from local law

enforcement if time and resources permit." Id.; Frice Declaration, ¶ 9.

Defendant Feld states that she previously had not been to Mr. Allen's house. Feld Declaration, ¶ 14.

Prior to going there, defendants Feld and Shaver "were assigned to enter and arrest" Mr. Allen. Id.; Frice

Declaration, ¶ 10.  They went to the front door and knocked. Feld Declaration, ¶ 14; Declaration of Anthony

Shaver ("Shaver Declaration"), ¶ 5.  The door was opened by a young girl, who turned out to be Mr. Allen's

daughter, plaintiff AA. Id.  Defendant Feld asked plaintiff AA if her father was at home, and she responded

that he was upstairs and asked if she should go get him. Id.

Defendants Feld and Shaver then entered the house, and defendant Feld announced themselves by stating: "Department of Corrections." Feld Declaration, ¶ 14; Shaver Declaration, ¶ 6.  Defendant Shaver "noticed a stairway to the right," and "moved ahead" of both defendant Feld and plaintiff AA. Shaver Declaration, ¶ 6.  Defendant Shaver "went up the stairs," and defendant Feld followed behind him. Id.  At the top of the stairs, they saw Mr. Allen "at the far end" of a narrow hallway. Feld Declaration, ¶ 15; Shaver Declaration, ¶ 7.  Both defendants state that defendant Shaver told Mr. Allen he was under "under arrest" and directed him "to turn around and put his hands behind his back." Id.

According to defendant Shaver, Mr. Allen asked him "why," and he responded by repeating his "instructions two or three times." Shaver Declaration, ¶ 7.  Mr. Allen then "complied by turning around in place and putting his hands behind his back." Id.; Feld Declaration, ¶15.  Defendant Shaver then approached Mr. Allen, placed him in handcuffs, escorted him downstairs, and "took him to a chair on the front porch." Feld Declaration, ¶ 15; Shaver Declaration, ¶¶ 7-8.  Defendant Feld then transported Mr. Allen to the Clark County jail, "where he was booked and held for the weekend." Feld Declaration, ¶ 16.

Defendant Shaver states that during the arrest of Mr. Allen, he "was wearing a DOC issued handgun in a holster on his right side," which was "not concealed." Shaver Declaration, ¶ 4.  According to a DOC policy directive, DOC "[s]taff who choose to carry firearms shall carry their firearms at all times while in the performance of their official field duties," "[f]irearms shall not be used to effect an arrest" unless the CCO "perceives a threat of great bodily harm or death," and DOC "[s]taff shall only use the level of force that is necessary to control a situation." Id.; see also Plaintiffs' Statement, Exhibit CC, Field Directive re: Firearms, DOC 200.460.

Defendant Shaver states that "[b]efore, during and after the arrest," he "had no reason to believe that" Mr. Allen "would resist arrest or present a risk of flight." Shaver Declaration, ¶ 5.  He further states that he "did not use any force" in arresting Mr. Allen, that he "did not need to use any force" to do so, and that he "did not unholster" his weapon "during the arrest." Id., ¶ 9.  In his declaration, defendant Frice also states that "[a]t no time during the whole arrest was any force used," nor did Mr. Allen "complain about any force having been used or about any weapon being drawn." Frice Declaration, ¶ 12.

Defendant Feld testified in her deposition that to the extent that defendant Shaver "was out of" her "line of sight at any given time" when they went upstairs to arrest Mr. Allen, it might "have only been a few seconds." Plaintiffs' Statement, Exhibit M.  However, defendant Feld testified that at no time did she see

1    defendant Shaver take his gun out of his holster. Id.  While defendant Feld did not recall if defendant Shaver

2    at any time put his hand on his gun, she testified he could have done so. Id.  In her declaration though, she

3    again states that she was "directly behind" defendant Shaver, that "[a]t no time did" she "observe any force

4    being used" or "any weapon drawn" by him, and that if he "had drawn his weapon," she "would have seen

5    it." Feld Declaration, ¶ 19.

6         Defendant Feld did not remember if plaintiff AA was behind her or in front of her when they went

7    up the stairs. Plaintiffs' Statement, Exhibit M.  In her own deposition for this case, plaintiff AA testified that

8    after she "walked a few steps into the [upstairs] hallway . . . [o]ne of the men in uniform walked" past her

9    and arrested her father. Id., Exhibit X.  She further testified that this man had followed her up the stairs. Id.

10   However, she also testified that she never saw anyone with a gun in his or her hand, and that, while she did

11   see a gun that day, it was in the "pocket" of the man who had followed her up the stairs. Id.

12        In his declaration, Mr. Allen states that as he was standing outside of his bedroom at the end of the

13   upstairs hallway talking to his wife, he saw plaintiff AA in the hallway and "a large man" behind her, who

14   turned out to be defendant Shaver. Allen Declaration, ¶ 20-21.  Mr. Allen states that defendant Shaver was

15   "holding a pistol" in his right hand, and that he "was holding it down and partially behind" plaintiff AA. Id.,

16   ¶ 21.  Mr. Allen further states that although "[i]t was hidden somewhat, . . . there was no doubt" in his mind

17   "that he had a gun in his hand." Id., ¶ 21.

18        Mr. Allen states that he "heard someone yell something about 'Department of Corrections!,'" and

19   that defendant Shaver was "yelling orders" at him "to turn around and put" his hands behind his back. Id.

20   Mr. Allen states that as he "began to comply with his orders," he saw defendant Shaver "put his gun in the

21   holster, grab the handcuffs, and move around" plaintiff AA "to her right." Id.  As related by defendants Feld

22   and Shaver above, Mr. Allen states that he then was handcuffed by defendant Shaver, taken downstairs by

23   him, and brought outside to sit on his front porch. Id.  He states that he was transported to the Clark County

24   Jail, where he "was held until the following Thursday," October, 23, 2003. Id., ¶ 22.

25        E.    Mr. Allen's Violation Hearing

26        On October 23, 2003, defendant Feld filed a "Notice of Violation" report with the Clark County

27   Superior Court, in which she stated that Mr. Allen's period of community supervision was due to terminate

28   on November 22, 2003, but that he had violated the conditions of his supervision by: (1) "[c]ommitting a

     like offense by peeping at a neighbor sometime during the months of July and/or August as disclosed in the

1    polygraph on 10/08/03"; and (2) "[v]iewing pornography as disclosed in the polygraph on 10/08/03." Feld

2    Declaration, Exhibit G, p. 1.  That report also had been "[a]pproved" by defendant Frice prior to its filing

3    with the Clark County Superior Court. <u>Id.</u>, p. 3.

4         Defendant Feld stated in the violation report that Mr. Allen had disclosed during his October 8,

5    2003 polygraph examination that while he "did not believe" he was "peeping" when he watched his

6    neighbor "for approximately two minutes" in July and/or August 2003, he "admitted that he was aware of

7    where his mind was going during the incident." <u>Id.</u>, p. 2.  Defendant Feld also stated that Mr. Allen's

8    "original offense of voyeurism involved similar behaviors of watching neighbors in their home." <u>Id.</u>

9         In addition, defendant Feld stated that Mr. Allen also had disclosed in his polygraph examination

10    that he "had looked at pornography on the computer." <u>Id.</u>  She stated, furthermore, that a forensic analysis of

11    Mr. Allen's computer revealed that he viewed a website called weightlesssex.com "for approximately two

12    minutes," which was "mirrored with another website, bungeesex.com, which it would appear that" he had

13    "typed in" that web address in order to go there. <u>Id.</u>

14         Defendant Feld concluded her report as follows:

15         Allen has been on supervision for 35 months.  He has complied with specific conditions
          regarding reporting and attending treatment.  In fact he will be completed with treatment

16         before his supervision ends in November 2003.  On the surface it would appear that
          Allen has done well on supervision, however these recent disclosures during his

17         polygraph are a concern for the Department of Corrections.  Allen has self-reported these
          behaviors and it appears that he is recognizing that these behaviors are not appropriate.

18         Nonetheless, these behaviors indicate that Allen is possibly in a pattern of behaviors that
          could result in a new victim.  In his polygraph on 05/27/03,[2] Allen disclosed that he had

19         fantasized about past peeping episodes.  During both the polygraphs on 05/27/03, and the
          more recent one conducted on 10/08/03, Allen disclosed that he had scanned the

20         television for sexually explicit material on several occasions.  All these high-risk
          behaviors are violations of Allen's conditions of supervision, and can lead to his

21         committing another offense.

22    <u>Id.</u>  She recommended Mr. Allen serve "10 days per violation for a total of 20 days jail." <u>Id.</u>, p. 3.

23         A violation hearing before the Clark County Superior Court was set for December 18, 2003. Feld

24    Declaration, ¶ 17.  In the meantime, Mr. Allen was released on his own recognizance without bail. <u>Id.</u>  It

25    appears the prosecuting attorney also decided to dismiss the violation regarding Mr. Allen's alleged use of

26    his computer to view pornography, because the forensic analysis of the computer discussed above showed

27    that he "had tried to access" the websites weightlessex.com and bungeesex.com, but his "internet service

28

                [2]This polygraph is not contained in the record before the Court.

1    provider blocked access beyond the home page of each site."[3] Frice Declaration, ¶ 13; Feld Declaration, ¶

2    18; Plaintiffs' Statement, Exhibit Z.

3        At the violation hearing, the Clark County Superior Court determined Mr. Allen "had not engaged

4    in any new voyeurism conduct and dismissed the voyeurism violation," and it released him "immediately

5    from further [community] supervision." Feld Declaration, ¶ 18 and Exhibit H; Allen Declaration, ¶ 23.  The

6    trial court's decision appears to have been based on evidence Mr. Allen's attorney presented to the court

7    "during a private conference," indicating that it was "not possible for anyone to see inside the neighbor's

8    bedroom from the Allen's residence." Feld Declaration, ¶ 18; Plaintiffs' Statement, Exhibit AA.  Mr. Allen

9    further states that during the hearing, the trial court "expressed concern" to defendant Feld "about the

10   amount of force that was used in arresting" him. Allen Declaration, ¶ 23.

11       F.    Procedural History in This Case

12       Defendants filed their motion for summary judgment on plaintiffs' section 1983 claims on July 18,

13   2006, arguing that: (1) plaintiffs' Fifth, Eighth and Fourteenth Amendments claims and their claims against

14   the State of Washington should be dismissed; (2) defendants Feld, Frice and Shaver are entitled to qualified

15   immunity with respect to plaintiffs' Fourth Amendment claims of unlawful arrest and excessive use of

16   force; and (3)  the federal claims made by plaintiffs Lisa Allen, AA, CA and SA should be dismissed. (Dkt.

17   #30).  Plaintiffs have filed a response to defendants' motion (Dkt. #38)[4] and defendants have replied thereto.

18   (Dkt. #40).  Defendants' motion for summary judgment on plaintiffs' section 1983 claims, therefore, is now

19   ripe for consideration.

20                                    DISCUSSION

21   I.    Standard of Review

22       Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no

23   genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

24   Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c).  In deciding whether summary judgment should

25

26   _____

27       [3]The Court notes though that the attempted access identified through the forensic analysis occurred on October 13, 2003,
     some five days after the polygraph was administered. Plaintiffs' Statement, Exhibit Z.

28       [4]Plaintiffs filed a motion for continuance of the original noting date for consideration of defendants' motion from August
     18, 2006, to August 25, 2006, due to an inability to file their response on time. (Dkt. #32).  Defendants have not objected to the
     motion for continuance.  Accordingly, plaintiffs' motion for continuance (Dkt. #32) hereby is GRANTED.

1  be granted, the Court must view the record in the light most favorable to the nonmoving party and indulge

2  all inferences favorable to that party. Fed. R. Civ. P. 56(c) and (e).  When a summary judgment motion is

3  supported as provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or

4  denials of his or her pleading, but that party's response, by affidavits or as otherwise provided in Fed. R.

5  Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  If

6  the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that

7  party. Id.

8         The moving party must demonstrate the absence of a genuine issue of fact for trial.  Anderson v.

9  Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  Mere disagreement or the bald assertion that a genuine

10  issue of material fact exists does not preclude summary judgment.  California Architectural Building

11  Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).  A "material" fact is one

12  which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the

13  suit," and the materiality of which is "determined by the substantive law governing the claim." T.W.

14  Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

15        Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of

16  summary judgment." Id.  Rather, the nonmoving party "must produce at least some 'significant probative

17  evidence tending to support the complaint.'" Id. (quoting Anderson, 477 U.S. at 290); see also California

18  Architectural Building Products, Inc., 818 F.2d at 1468 ("No longer can it be argued that any disagreement

19  about a material issue of fact precludes the use of summary judgment.").  In other words, the purpose of

20  summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory

21  allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

22  II.    Plaintiffs' Claims that Defendants Violated Mr. Allen's Fifth, Eighth and Fourteenth Amendment
        Rights Are Without Merit

23

24        In their first amended complaint, plaintiffs allege defendants' actions described above violated Mr.

25  Allen's Fifth, Eighth and Fourteenth Amendment rights to "due process, equal protection and freedom from

26  excessive punishment." Plaintiffs' First Amended Complaint, p. 2.  Defendants argue these claims must fail,

27  because all allegations concerning unlawful seizures and excessive use of force, which lie at the heart of this

28  case, must be analyzed under the Fourth Amendment.  The Court agrees.

        In reviewing claims of unlawful arrest or seizure or excessive use of force brought under section

1    1983, the Court first must identify "the specific constitutional right allegedly infringed by the challenged

2    application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). "The validity of the claim must then be

3    judged by reference to the specific constitutional standard which governs that right, rather than to some

4    generalized 'excessive force' standard." Id. Where an excessive force claim "arises in the context of an

5    arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections

6    of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against

7    unreasonable seizures" of the person."[5] Id.

8          The protections of the Fourth Amendment apply equally with respect to claims of unlawful arrest or

9    seizure of those not incarcerated. See Albright v. Oliver, 510 U.S. 266, 271-74 (1994) (holding plaintiff's

10   claim of unlawful arrest must be judged under Fourth Amendment and not substantive due process); see

11   also Blackwell v. Barton, 34 F.3d 298, 302 (5th Cir. 1994) (citing to Graham, 490 U.S. 386) ("Although the

12   present case does not involve a claim of excessive force, the reasoning of *Graham* is equally applicable to

13   Blackwell's claim for illegal arrest.").

14         In certain situations, substantive due process and the Eighth Amendment's prohibition against cruel

15   and unusual punishment, rather than or in addition to the Fourth Amendment's protections, will apply. For

16   example, in the excessive use of force context, while the issue of whether the Fourth Amendment continues

17   to provide protection "beyond the point at which arrest ends and pretrial detention begins," has not yet been

18   resolved, "[i]t is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive

19   force that amounts to punishment." Graham, 490 U.S. at 395 n.10. In addition, it is the Eighth Amendment

20   that "serves as the primary source of substantive protection" for convicted prisoners "where the deliberate

21   use of force is challenged as excessive and unjustified." Id. (citation omitted).

22         This case, however, involves the arrest of Mr. Allen in his home. Although he was on community

23   supervision during the relevant time period at issue here, and thus still subject to the authority of the DOC,

24   Mr. Allen was not a pretrial detainee, nor do the Eighth Amendment's protections apply, as that amendment

25   "is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions." Whitley

26

27         [5]"The Fourth Amendment . . . forbids governmental violation of '[t]he right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches and seizures." Pierce v. Smith, 117 F.3d 866, 872 (5th Cir. 1997). "A
28   'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, "by means of physical force
or show of authority, . . . in some way restrained the liberty of a citizen." Graham, 490 U.S. at 395 n.10 (quoting Terry v. Ohio,
392 U.S. 1, 19 n.16 (1968).

1  v. Albers, 475 U.S. 312, 327 (1986).  In their response to defendants' summary judgment motion, plaintiffs

2  do not contest the assertion that the Eighth Amendment does not apply.  Rather, plaintiffs now argue that

3  "the unilateral revocation" of Mr. Allen's release into community supervision "comes within the purview"

4  of the Fourteenth Amendment's procedural due process protections. Plaintiffs' Memorandum in Response

5  to Defendants' Motion for Summary Judgment ("Plaintiffs' Response"), p. 9.

6        That argument, however, is without merit.  First, although plaintiffs' do reference the Fourteenth

7  Amendment in their first amended complaint, nowhere therein do they claim that "the unilateral revocation"

8  of Mr. Allen's release violated his procedural due process rights.  Second, even if it can reasonably be said

9  that plaintiffs validly raised this issue in their first amended complaint, it appears from the record currently

10  before the Court that Mr. Allen received all of the process he was due concerning his arrest and subsequent

11  community supervision violation hearing.

12        In support of his argument, plaintiff relies on the decision of the United States Supreme Court in

13  Morrissey v. Brewer, 408 U.S. 471 (1972).  In that case, the Supreme Court was dealing with the issue of

14  "whether the Due Process Clause of the Fourteenth Amendment requires that a State afford an individual

15  some opportunity to be heard prior to revoking his parole." Id. at 472.  There, two parolees, who had been

16  arrested for violating the conditions of their parole, were placed in jail, had their paroles revoked without

17  first receiving a hearing, and then were recommitted to prison. Id. at 472-74.

18        In remanding the case back to the lower courts, the Supreme Court held that parolees were entitled

19  to receive certain minimum due process procedures before having their paroles revoked, and set forth what

20  those procedures were.  For example, the Supreme Court stated that "as promptly as convenient after

21  arrest," a determination, "in the nature of a 'preliminary hearing,'" that reasonable grounds exist "for

22  revocation of parole should be made by someone not directly involved in the case," who "need not be a

23  judicial officer," but merely someone "other than the one who has made the report of parole violations or

24  has recommended revocation," including another parole officer. Id. at 485-86.

25        With respect to the nature of the actual preliminary hearing, the Supreme Court in Morrissey went

26  on to state in relevant part as follows:

27       [T]he parolee should be given notice that the hearing will take place and that its purpose
         is to determine whether there is probable cause to believe he has committed a parole
28       violation.  The notice should state what parole violations have been alleged.  At the
         hearing the parolee may appear and speak in his own behalf; he may bring letters,
         documents, or individuals who can give relevant information to the hearing officer.  On

request of the parolee, [the] person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence.

Id. at 486-87.  The Supreme Court also held that "[t]here must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority." Id. at 487-88.  That hearing must "be tendered within a reasonable time after the parolee is taken into custody," and provide the parolee with the "opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation." Id. at 488.

In this case, Mr. Allen's first appearance before an uninvolved decision-maker was before the Clark County Superior Court on October 20, 2003, just three days after he was arrested. Feld Declaration, ¶ 17. While the matter was set "over" until October 23, 2003, and then to December 18, 2003 (id.), plaintiff has not shown that he objected to this delay, nor has he claimed a due process violation based on the length of such delay.  Indeed, even if plaintiff had made such an claim, it appears that it would fail.  See Morrissey, 408 U.S. at 488 (lapse of two months from time parolee is taken into custody and date revocation hearing is held would not appear to be unreasonable).  It also appears plaintiff was given every opportunity to be heard and to contest the alleged community supervision violation regarding peeping made against him, as, indeed, his attorney succeeded in having that allegation dismissed.

Instead, plaintiffs' argument is premised on certain quoted language from the dissent in Morrissey, which argued that "[i]f a violation of a condition of parole is involved, rather than the commission of a new offense, there should not be an arrest of the parolee and his return to the prison or to a local jail."[6] Id. at 497 (Douglas, J., dissenting in part).  Needless to say, a dissenting opinion, no matter how persuasive or helpful to a party's position it may be, is not the Supreme Court's actual holding, and, as such, does not constitute legal precedent, binding or otherwise.  Rather, as discussed above, the only process Mr. Allen was due under Morrissey was proper notice and the opportunity to be heard before an uninvolved decision-maker after his arrest, and there has been no showing that he did not receive such in this case.

III.    Plaintiffs' Claims Against the State of Washington Are Barred by the Eleventh Amendment

Under the Eleventh Amendment to the United States Constitution, a state is not subject to suit by

---

[6]The dissent went on to state that: "[r]ather, notice of the alleged violation should be given to the parolee and a time set for a hearing." Id.

ORDER
Page - 15

its own citizens in federal court.[7] <u>Edelman v. Jordan</u>, 415 U.S. 651, 662-63 (1974).  A state agency, as an arm of the state, is immune from suit in federal court under the Eleventh Amendment as well. <u>Howlett v. Rose</u>, 496 U.S. 356, 365 (1990); <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 70 (1989).  An entity that has Eleventh Amendment immunity also is not a "person" within the meaning of 42 U.S.C. § 1983.[8] <u>Howlett</u>, 496 U.S. at 365.

Plaintiffs have named the State of Washington as a defendant in this case.  As noted above, however, a state is immune from suit under the Eleventh Amendment.  In addition, the DOC, though not specifically named as a defendant, is, as an arm of the state itself, also immune from liability in this action.  Plaintiffs counter that the State of Washington should not be found to be immune from liability, because "there are material factual disputes" as to whether the DOC's "policies and customs led to the violation" of their rights. Plaintiffs' Response, pp. 10-11.  Plaintiffs, however, appear to confuse the issue of state liability with that of municipal or other <u>local</u> government entity liability.

Plaintiff cites to <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), for the proposition that governmental agencies may be liable under section 1983 when the action alleged to be unconstitutional was an officially adopted policy or was undertaken pursuant to a custom.  The Supreme Court in <u>Monell</u>, however, specifically held that such was the case only with respect to suits brought against "municipalities and other local government units." <u>Id.</u> at 690-91.  Indeed, the Supreme Court proclaimed in no uncertain terms that "[o]ur holding today is, of course, limited to <u>local</u> government units which are <u>not</u> considered part of the State for Eleventh Amendment purposes." <u>Id.</u> at 691 (emphasis added).  As the State of Washington is clearly not a unit of local government, <u>Monell</u> is wholly inapplicable here.[9]

---

[7]The Eleventh Amendment reads in relevant part: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend XI.

[8]Section 1983 reads in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

[9]Plaintiff also cites to <u>Lee v. City of Los Angeles</u>, 250 F.3d 668 (9th Cir. 2001), for the proposition that a government entity's failure to train its employees creates section 1983 liability where such failure to train "amounts to a deliberate indifference to the rights of persons with whom those employees are likely to come into contact." Plaintiff's Response, p. 11 (quoting <u>Lee</u>, 250 F.3d at 681).  Again, however, as with the Supreme Court's holding in <u>Monell</u>, the Ninth Circuit's holding in <u>Lee</u> is limited to municipalities or other local governmental entities. Lastly, plaintiff's reliance on <u>McRorie v. Shimoda</u>, 795 F.2d 780 (9th Cir.

IV.    The Doctrine of Qualified Immunity

Prior to determining whether defendants Feld, Frice and Shaver are entitled to qualified immunity, the Court first must determine if plaintiffs have "alleged the deprivation of an actual constitutional right at all." Conn v. Gabbert, 526 U.S. 286, 290 (1999).  If they have not done so, then the issue of qualified immunity does not come before the Court. Id. at 293.  When making this initial determination, however, the Court must view the facts "in the light most favorable to the party asserting the injury." Saucier v. Katz, 533 U.S. 194, 201 (2001).

Under the doctrine of qualified immunity, state officials "performing discretionary functions [are protected] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Somers v. Thurman, 109 F.3d 614, 617 (9th Cir. 1997).  To determine whether a state official is entitled to qualified immunity, the court must perform a two part inquiry.  First, the court considers "whether the law governing the official's conduct was clearly established." Somers, 109 F.3d at 617.  If the law was not clearly established at the time, "the official is entitled to immunity from suit." Id. If the law was so established, the court next asks whether "under that law, a reasonable official would have believed the conduct was lawful." Id.  Thus, "an official is denied qualified immunity only if the law was clearly established and a reasonable official could not have believed the conduct was lawful." Id.

The above inquiry "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'" Grossman v. City of Portland, 33 F.3d 1200, 1208 (9th Cir. 1994) (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987)).  To defeat a claim of qualified immunity, the unlawfulness of the state official's conduct must be "apparent." Id. (citing Anderson, 483 U.S. at 640).  This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (citation omitted); Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001).  Such an "accommodation for reasonable error" has been made "because 'officials should not err always on the side of caution' because they fear being sued." Hunter, 502 U.S. at 229 (citation omitted).

_____

1984), is misplaced as well, as that case, which involved an allegation that a prison guard was ordered by his superiors to injure the plaintiff in retaliation for filing lawsuits, is distinguishable on its facts. Id. at 781.  Here, no such "requisite causal connection" between either defendant Feld or defendant Frice and their superiors has been made, or even alleged. Id. at 783-84.

1          A.          Plaintiffs' Unlawful Arrest Claim

2          Defendants argue defendants Feld, Frice and Shaver are entitled to qualified immunity with respect

3     to plaintiffs' claim of unlawful arrest.  They argue there was no unlawful arrest, because defendants Feld

4     and Frice had a reasonable suspicion that Mr. Allen violated the conditions of his sentence.  Plaintiffs

5     counter that there are genuine issues of material fact as to whether defendant Feld and defendant Frice acted

6     reasonably in their decision to arrest Mr. Allen.[10]  Even viewing the evidence in the record in the light most

7     favorable to plaintiffs, however, the Court finds no genuine issues of material fact here.  As such, the Court

8     further finds plaintiffs have failed to sufficiently allege the deprivation of a constitutional right.

9          In general, "citizens enjoy the right not to be seized or arrested absent probable cause."  Knox v.

10    Smith, 342 F.2d 651, 657 (7th Cir. 2003).  Those subject to parole or probation, however, "have a more

11    limited liberty interest than ordinary citizens."[11]  Id. (citing Morrisey v. Brewer, 408 U.S. 471, 480 (1972)

12    ("Revocation [of parole] deprives an individual, not of the absolute liberty to which every citizen is entitled,

13    but only of the conditional liberty properly dependant on observance of special parole restrictions.")); see

14    also United States v. Knights, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that

15    probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'") (citation and internal

16    quotation marks omitted).

17          This more limited liberty interest on the part of parolees and probationers is because, as the

18    Supreme Court has stated:

19          The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a
            search is determined "by assessing, on the one hand, the degree to which it intrudes upon
20          an individual's privacy and, on the other, the degree to which it is needed for the
            promotion of legitimate governmental interests."
21
22    Knights, 534 U.S. at 118-19 (citation omitted).  "In assessing the governmental interest side of the balance,"

23    _____

24          [10]As noted above, defendants Feld and Frice both state in their declarations and testified in their depositions that it was
      their decision to arrest Mr. Allen.  Also as noted above, defendant Shaver indicated in his deposition testimony that it was
25    defendant Frice who wanted to make sure that Mr. Allen was arrested.  Plaintiffs have not alleged the decision to arrest Mr. Allen
      was anyone's other than defendants Feld and Frice.  Thus, the determination as to whether defendant Shaver is entitled to
26    qualified immunity in regard to plaintiffs' unlawful arrest claim, necessarily rests on the determination regarding defendants Feld
      and Frice.

27
      [11]Although the terms "parole," "probation" and "community supervision" have different legal connotations, for purposes
28    of Fourth Amendment analysis regarding plaintiffs' unlawful arrest claim, those terms generally are treated as one and the same,
      and thus they, along with the terms "parolee" and "probationer," shall be used interchangeably herein. See, e.g., State v. Massey,
      81 Wn. App. 198 (1996).

ORDER
Page - 18

1  furthermore, "it must be remembered that 'the very assumption of the institution of probation' is that the

2  probationer 'is more likely than the ordinary citizen to violate the law.'" <u>Id.</u> at 120 (citation omitted).  The

3  government's "interest in apprehending violators of the criminal law, thereby protecting potential victims of

4  criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary

5  citizen." <u>Id.</u> at 121; <u>see also</u> <u>Knox</u>, 342 F.3d at 657.

6  As such, the seizure of a parolee or probationer "requires something less than probable cause to be

7  reasonable under the Fourth Amendment." <u>Knox</u>, 342 F.3d at 657.  Rather, "the balance" of considerations

8  set forth above "requires no more than reasonable suspicion to conduct" a search or seizure of a parolee or

9  probationer. <u>Knights</u>, 534 U.S. at 121.  As the Supreme Court in <u>Knights</u> went on to state:

10     The degree of individualized suspicion required of a search is a determination of when
       there is a sufficiently high probability that criminal conduct is occurring to make the
11     intrusion on the individual's privacy interest reasonable. . . . Although the Fourth
       Amendment ordinarily requires the degree of probability embodied in the term "probable
12     cause," a lesser degree satisfies the Constitution when the balance of governmental and
       private interests makes such a standard reasonable. . . . Those interests warrant a lesser
13     than probable-cause standard here.  When an officer has reasonable suspicion that a
       probationer subject to a search condition is engaged in criminal activity, there is enough
14     likelihood that criminal conduct is occurring that an intrusion on the probationer's
       significantly diminished privacy interests is reasonable.
15

16  <u>Id.</u> ("The same circumstances that lead us to conclude that reasonable suspicion is constitutionally

17  sufficient also render a warrant requirement unnecessary.").

18     A probation search is constitutionally permissible if it is "conducted pursuant to a state law that

19  satisfies the Fourth Amendment's reasonableness standard." <u>United States v. Conway</u>, 122 F.3d 841, 842

20  (9th Cir. 1997); <u>United States v. Garcia-Cruz</u>, 978 F.2d 537, 541 (9th Cir. 1992) (parole search proper if

21  conducted in manner consistent with state law).  Under Washington statutory law: "[i]f there is reasonable

22  cause to believe that an offender has violated a condition or requirement of the sentence, an offender may be

23  required to submit to a search and seizure of the offender's person, residence, automobile, or other personal

24  property." RCW 9.94A.631; <u>see also</u> RCW 9.94A.740(1) (community corrections officer may suspend

25  offender's community placement or community custody and arrest and detain him or her, if "reasonable

26  cause" exists to believe offender has violated condition of such placement or custody).[12]

27

28  ──────────────
       [12]"A violation of a condition of community placement or community custody shall be deemed a violation of the sentence
    for purposes of RCW 9.94A.631.  The authority granted to community corrections officers under this section shall be in addition
    to that set forth in RCW 9.94A.631." RCW 9.94A.970(1).

ORDER
Page - 19

The term "reasonable cause" has been defined by the Washington State Court of Appeals to mean "a well-founded suspicion that a [probation] violation has occurred." Conway, 122 F.3d at 842 (quoting Massey, 81 Wn. App. at 200); see also State v. Lucas, 56 Wn. App. 236, 243 (1989).  Reasonable cause or suspicion "is a legal conclusion based upon the particular circumstances of a given case." Massey, 81 Wn. App. at 201.  The Ninth Circuit has noted the Washington statutory language's "similarity" to Wisconsin's, which was considered by the Supreme Court in Griffin v. Wisconsin, 483 U.S. 868 (1987). Conway, 122 F.3d at 842 (Washington statute's similarity to Wisconsin's dictates result).

In Griffin, the Supreme Court held that a police search of a probationer's residence that was based on information received from a confidential informant was "'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." Id. at 880.  In so holding, the Supreme Court further held in relevant part that:

> [B]ecause it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, we think it enough if the information provided indicates . . . only the likelihood . . . of facts justifying the search.

Id.  Other federal and state decisions are instructive as well.

As in Washington, under California law, "a parole agent may search the residence of a parolee if he has a reasonable suspicion that the 'parolee is again involved in criminal activity, . . . and that the search may turn up evidence of that activity.'" Garcia-Cruz, 978 F.2d at 541 (citation omitted).  The Ninth Circuit noted without disapproval the California state courts' requirement that for such searches to be proper, "[t]he suspicion must 'be based on articulable facts which together with rational inferences from those facts warrant objectively reasonable suspicion.'" Id. (citation omitted).

Here, defendants have presented "articulable facts" from which they state defendants Feld and Frice based their decision to arrest Mr. Allen.  In addition, the "rational inferences" that could have been drawn therefrom, warranted an "objectively reasonable suspicion" that a violation had occurred.  First, Mr. Allen admitted on the October 8, 2003 polygraph examination pre-test interview that he peeped on his neighbor and looked at pornography on the internet.  This, as defendants point out, "provided objective evidence that led to a reasonable suspicion" he had "engaged in prohibited activity." Defendants' Reply Memorandum in Opposition to Plaintiffs' Response ("Defendants' Reply"), p. 3-4 (Dkt. #40).  While Mr. Allen denies he ever used the words "peep," "peeping" or "peeped," such denial does not do away with the fact that

1  defendants had the right to reasonably rely on the report of Mr. Yunck, an independent and uninterested

2  expert.

3          Even if one takes into account at face value, as plaintiffs would have the Court do, the fact that, as

4  noted above, a number of Mr. Allen's pre-test interview questions were contradictory or ambiguous – for

5  example, Mr. Allen's statements that his looking at his neighbor was not a peeping experience to him and

6  that he "got away" before it became one – reasonable suspicion was established here.  Although, as noted

7  above, reasonable suspicion must be based on articulable facts and rational inferences, this requires merely

8  that defendants "be able to articulate something more than an 'inchoate and unparticularized suspicion'" or

9  "hunch." United States v. Sokolow, 490 U.S. 1, 7 (1999) (citing Terry v. Ohio, 392 U.S. 1, 27 (1968)).

10 Thus, the fact that Mr. Allen's pre-test interview answers indicated that he may have been engaging in

11 activity similar to or constituting the crime for which he was convicted was sufficient here.  That is, based

12 on those answers, defendants Feld and Frice rationally could have inferred that Mr. Allen had violated the

13 conditions of his sentencing and supervision.

14         The same thing is true with respect to what Mr. Yunck recorded Mr. Allen as stating concerning his

15 alleged use of his computer to search for pornography on the internet.  That is, while Mr. Allen stated that

16 he was tempted to but did not "scan for sexual things on the computer" and did not do anything else when

17 he knew it was wrong to do, he also was recorded as having stated that he did look at pornography on the

18 computer, including "still pictures of naked adult females showing their breasts."  Again, the fact that this

19 latter statement – though certainly contradictory to some extent with the other answers he also provided –

20 indicated Mr. Allen had viewed specific pornographic images on the internet, constitutes something more

21 than a mere inchoate and unparticularized suspicion or hunch.

22         The fact that it may have been later determined by a forensic analysis that Mr. Allen did not access

23 pornography on his computer, however, is not relevant to the determination of reasonableness here.  See

24 Conway, 122 F.3d at 843 ("Washington law does not require that the search be necessary to confirm the

25 suspicion of impermissible activity.").[13]  That is, such information was not available to defendants Feld or

26

27         [13]For the same reason, the fact that Mr. Allen ultimately was found by the Clark County Superior Court not to have
28 violated his sentencing conditions by peeping on his neighbor, cannot be relied on to show that defendants Feld and Frice were
   unreasonable in suspecting that he had engaged in conduct similar to that for which he was originally convicted.  So too will lack
   of reasonable suspicion not be found merely on the basis that none of the defendants present during the search and seizure of Mr.
   Allen checked to see if it was possible to peep on Mr. Allen's neighbor as described in the pre-test interview report.  Indeed, at

1   Frice, as that analysis was not completed until October 27, 2003, two weeks after defendant Frice received

2   Mr. Yunck's report and ten days after the decision to arrest Mr. Allen was made. See Plaintiff's Statement,

3   Exhibit Z. Even if defendants Feld and Frice had obtained the forensic analysis earlier, furthermore, it

4   likely merely would have confirmed their suspicions, as it shows Mr. Allen tried to access a pornographic

5   website on October 13, 2003, five days after his pre-test interview was conducted. See id.

6       Plaintiff further argues it was not reasonable for defendant Feld and defendant Frice to have relied

7   on Mr. Allen's pre-test interview answers, because defendant Feld lacked proper training and background in

8   the conduct and use of polygraph examinations.  That fact, plaintiffs assert, along with the inconsistencies

9   contained in the pre-test interview transcript noted above, and the fact that Mr. Allen was found to not have

10  attempted deception in answering "no" to the questions of whether he had deliberately peeped on anyone or

11  engaged in other illegal sexual activity, should have put defendant Feld on notice that further investigation

12  might be needed before commencing an arrest.

13      As defendants point out, however, there is no requirement that a parole, probation or community

14  corrections officer must engage in fact-finding or conduct any further investigation to confirm what actually

15  happened prior to arresting an offender on community supervision.  Indeed, plaintiffs have cited to no legal

16  authority finding there to be such a requirement.  It certainly may be true that there was no indication of

17  non-compliance with Mr. Allen's conditions of community supervision in his DOC and treatment records

18  prior to the October 8, 2003 pre-test interview. See, e.g., Feld Declaration, Exhibit G, p. 2; Plaintiffs'

19  Statement, Exhibit D).  The fact is, however,  given the nature of the crime for which he was sentenced, the

20  "high risk offender" status he was designated with, and the potential liability DOC faced by not acting in a

21  prompt manner, Mr. Allen's pre-test interview answers reasonably resulted in defendant Feld and defendant

22  Frice suspecting Mr. Allen had engaged in unlawful conduct.

23      Similarly, although defendant Frice may have erroneously believed that Mr. Allen had signed the

24  pre-test interview transcript, indicating he agreed with the recorded answers contained therein and therefore

25  had adopted them (see Plaintiffs' Statement, Exhibit B), this does not necessarily mean he would not have

26  sought Mr. Allen's arrest anyway or that he would have been unreasonable in doing so.  Again, with or

27  without such a signed adoption, the pre-test interview answers themselves still provided a sufficient and

28

that point the search and seizure had already been effected.

1    articulable basis upon which defendants Feld and Frice could have formed a reasonable suspicion regarding

2    Mr. Allen's behavior.

3           The Court also rejects plaintiffs' inference that defendant Frice's alleged determination that Mr.

4    Allen be arrested no matter what and that defendant Feld not be talked out of arresting him, as evidenced by

5    defendant Shaver's deposition testimony, made that determination unreasonable or the arrest unlawful.

6    "With the limited exception of some special needs and administrative search cases," the Supreme Court has

7    "been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual

8    officers." Knights, 534 U.S. at 122 (internal and external citations omitted); see also Anderson, 483 U.S. at

9    641 (law enforcement official's subjective beliefs irrelevant).  Thus, defendant Frice's actual intent has no

10   bearing on the Court's analysis here.

11          Accordingly, this Court finds that defendants had a reasonable suspicion that Mr. Allen had violated

12   the conditions of his sentence, and that there was no violation of Mr. Allen's constitutional rights under the

13   Fourth Amendment.  In light of the fact there has been no constitutional violation, the issue of qualified

14   immunity does not arise here.

15          B.    Plaintiffs' Excessive Use of Force Claim

16          To determine whether the force used by law enforcement officials "to effect a particular seizure is

17   'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the

18   intrusion on the individual's Fourth Amendment interests' against the countervailing governmental

19   interests at stake." Graham at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985) (quoting United

20   States v. Place, 462 U.S. 696, 703 (1983))).  This "balancing of competing interests" has been described as

21   "the key principle of the Fourth Amendment." Garner, 471 U.S. at 8 (quoting Michigan v. Summers, 452

22   U.S. 692, 700 n.12 (1981)).  Since one of the factors in determining whether a particular use of force is

23   excessive "is the extent of the intrusion, . . . reasonableness depends on not only when a seizure is made,

24   but also how it is carried out." Id.; see also Graham, 490 U.S. at 395.

25          A claim of excessive use of force is "properly analyzed under the Fourth Amendment's 'objective

26   reasonableness' standard." Graham, 490 U.S. at 388.  This inquiry, furthermore, "is one of 'objective

27   reasonableness' under the circumstances." Id. at 399.  Thus, "the question is whether the officers' actions

28   are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their

     underlying intent or motivation." Id. at 397.  "[P]roper application" of the test of reasonableness "requires

ORDER
Page - 23

1   careful attention to the facts and circumstances of each particular case, including the severity of the crime at

2   issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

3   actively resisting arrest or attempting to evade arrest by flight." Id. at 396; Garner, 471 U.S. at 8-9 (question

4   is whether totality of circumstances justifies particular type of seizure).

5          Whether a particular use of force is reasonable "must be judged from the perspective of a reasonable

6   officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 ("[T]he . . .

7   standard of reasonableness at the moment applies."). In addition, the Court's "calculus of reasonableness

8   must embody allowance for the fact that police officers are often forced to make split-second judgments – in

9   circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in

10  a particular situation." Id. at 396-97. Further, it has been long recognized that the right of law enforcement

11  officials "to make an arrest or investigatory stop necessarily carries with it the right to use some degree of

12  physical coercion or threat thereof to effect it." Id. at 396.

13         As discussed above, the parties are in disagreement as to whether defendant Shaver actually drew

14  his gun during the arrest of Mr. Allen. As this issue goes to the heart of plaintiffs' excessive use of force

15  claim, there obviously is a genuine issue of material of fact here. Nevertheless, defendants argue that, even

16  accepting Mr. Allen's version of what happened – i.e., that defendant Shaver briefly drew his weapon, held

17  it down and partially behind plaintiff AA, and then holstered it prior to arresting him – those facts do not

18  amount to an excessive use of force. While the Court finds that there is a material issue of fact as to

19  whether such action constitutes excessive use of force under the Fourth Amendment, plaintiffs have not

20  shown, for the purposes of qualified immunity analysis, that it would have been unreasonable for defendant

21  Shaver to have believed such action was lawful.

22         That there are genuine issues of material fact as to whether defendant Shaver actually drew his gun,

23  and whether doing so constituted the excessive use of force, is merely the first step in determining whether

24  defendant Shaver is entitled to qualified immunity. Rather, he also must have had an unreasonable belief

25  that such conduct was lawful. As the Supreme Court has stated in explaining this distinction:

26         If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back,
           for instance, the officer would be justified in using more force than in fact was needed.

27
           The qualified immunity inquiry, on the other hand, has a further dimension. The concern
28         of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the
           legal constraints on particular police conduct. It is sometimes difficult for an officer to
           determine how the relevant legal doctrine, here excessive force, will apply to the factual

ORDER
Page - 24

situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Saucier, 533 U.S. at 206.

Qualified immunity, therefore, "operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force,' . . . and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Id. (internal citation omitted).  As the Supreme Court went on to state:

> The deference owed officers facing suits for alleged excessive force is not different in some qualitative respect from the probable-cause inquiry . . . Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.  Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, Anderson[ v. Creighton, 483 U.S. 635 (1987)] still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

Id.; see also Anderson, 483 U.S. at 641 ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable").

In the context of law enforcement, "[t]he doctrine of qualified immunity assumes that police officers do not knowingly violate the law." Gasho v. U.S., 39 F.3d 1420, 1438 (9th Cir. 1994).  As such, a police officer "is presumed to be immune from any damages caused by his constitutional violation." Id.  This presumption may be rebutted, but "[t]he plaintiff bears the burden of showing that the constitutional right allegedly violated was clearly established 'before the defendant acted or failed to act.'" Casteel v. Pieschek, 3 F.3d 1050, 1053 (7th Cir. 1993); see also Brewster v. Board of Education, 149 F..3d 971, 977 (9th Cir. 1998); Saucier, 533 U.S. at 208 ("The question is what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards.").  To rebut this presumption, plaintiff must "offer either a closely analogous case or evidence that the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts." Casteel, 3 F.3d at 1053.

To preclude qualified immunity, however, "it is not necessary that 'the very action in question has previously been held unlawful,' or that the plaintiff 'point to a previous case that differs only *trivially* from

1    his case.'" Pierce, 117 F.3d at 882 (emphasis in original) (internal and external citations omitted).  The facts

2    of the prior case though, "do need to be *materially* similar." Id. (emphasis in original) (citation omitted);

3    Conner v. Reinhard, 847 F.2d 384, 388 (7th Cir. 1988) (case law in closely analogous area is essential to

4    permit court to conclude constitutional right was clearly established at time of alleged violation).  Further,

5    as noted above, "the egregiousness and outrageousness of certain conduct may suffice to obviously locate it

6    within the area proscribed by a more general constitutional rule." Pierce, 117 F.3d at 882; see also Sweaney

7    v. Ada County, 119 F.3d 1385, 1389 (9th Cir. 1997) ("The absence of any authority directly on point is not

8    fatal to a section 1983 claim.  A right is clearly established '[i]f the only reasonable conclusion from

9    binding authority were that the disputed right existed.") (internal and external citations omitted).

10           Plaintiffs correctly assert there are issues of material fact as to whether defendant Shaver drew his

11    gun and whether it was an excessive use of force to do so.  Thus, plaintiffs argue defendants motion should

12    not be granted, because "[t]he determination of whether a reasonable officer could have believed his

13    conduct was lawful is a determination of law that can be decided on summary judgment only if the material

14    facts are undisputed." Plaintiffs' Response, p. 4 (citing LaLonde v. County of Riverside, 204 F.3d 947, 953

15    (9th Cir. 2000)); see also Thompson v. Mahre, 110 F.3d 716, 719 (9th Cir. 1997) ("[W]here there is a

16    genuine issue of fact on a substantive issue of qualified immunity, ordinarily the controlling principles of

17    summary judgment . . . require submission to a jury.").  However, the "issues of disputed fact," must be

18    ones on which "the question of immunity turns." Conner, 847 F.2d at 388.

19           Indeed, the Supreme Court has rejected the proposition that summary judgment should be denied

20    "any time a material issue of fact remains" with respect to the underlying constitutional violation claim, as

21    this "could undermine the goal of qualified immunity."[14] Saucier, 533 U.S. at 202-04 (noting inquiries for

22    qualified immunity and excessive force remain distinct); see also Anderson, 483 U.S. 635 (1987) (rejecting

23    argument that there is no distinction between reasonableness standard for warrantless searches and qualified

24    immunity inquiry).  That is, just because an officer may have a mistaken understanding regarding the facts

25    supporting the reasonableness of a particular use or level of force, does not necessarily mean any mistake in

26    believing his or her actions to be lawful was itself unreasonable.  Thus, in addition to showing that there is a

27

28

---

[14]"[T]o 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" Saucier, 533 U.S. at 202 (citation omitted).

1  genuine issue of material fact as to whether a constitutional right was violated, plaintiffs also must show that

2  right was clearly established at the time of the alleged violation.[15] <u>Saucier</u>, 533 U.S. at 201.

3          To make this additional showing though, it "is not enough" to establish that an arrest or use of force

4  was "contrary to the Fourth Amendment . . . under objective standards of reasonableness." <u>Id.</u> Rather, the

5  right the law enforcement official "is alleged to have violated:

6          [M]ust have been 'clearly established' in a more particularized, and hence more relevant,
           sense: The contours of the right must be sufficiently clear that a reasonable official would
7          understand that what he is doing violates that right." . . . The relevant, dispositive inquiry
           in determining whether a right is clearly established is whether it would be clear to a
8          reasonable officer that his conduct was unlawful in the situation he confronted.

9  <u>Id.</u> at 202 (internal and external citations omitted); <u>Brewster</u>, 149 F.3d at 977 ("[P]ublic officials must be

10  given clear notice that their conduct is unlawful."). Thus, "[i]f the law did not put the officer on notice that

11  his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."

12  <u>Saucier</u>, 533 U.S. at 202; <u>Conner</u>, 847 F.2d at 388 (test for immunity is whether law was clear in relation to

13  specific facts confronting public official when he or she acted).

14          Plaintiffs argue defendant Shaver's alleged use of his gun during the arrest of Mr. Allen constituted

15  an excessive use of force under the circumstances. Specifically, plaintiffs assert such use was contrary to

16  policies and procedures established by the DOC. However, "[o]fficials sued for constitutional violations do

17  not lose their qualified immunity merely because their conduct violates some statutory or administrative

18  provision." <u>Davis v. Scherer</u>, 468 U.S. 183, 194 (1984); <u>see also</u> <u>Elder v. Holloway</u>, 510 U.S. 510, 515

19  (1994) ("[A]n official's clear violation of a state administrative regulation does not allow a § 1983 plaintiff

20  to overcome the official's qualified immunity."). Thus, defendant Shaver's alleged violation of any policy

21  or procedure of the DOC will not, in itself, be sufficient to deny qualified immunity on plaintiffs' excessive

22  use of force claim.

23

24

25

26          [15]Plaintiffs also cite to the Ninth Circuit's decision in <u>Liston v. County of Riverside</u>, 120 F.3d 965 (9th Cir. 1997), for
27  the proposition that "the reasonableness of force used is ordinarily a question of fact for the jury. <u>Id.</u> at 976 n.10 (noting, however,
    that if district court concludes, after resolving all factual disputes in favor of plaintiff, defendant officers can still win on summary
28  judgment if use of force was objectively reasonable under circumstances). Once more, as in the unlawful arrest context, the mere
    fact that an issue of material fact exists in regard to the underlying constitutional claim, does not alone mean defendants are not
    entitled to qualified immunity on summary judgment.

1    Such a violation though may go to the reasonableness of defendant Shaver's actions.[16]  As discussed

2    above, pursuant to a DOC policy directive, all firearms carried by DOC staff are not to be used to effect an

3    arrest, unless a threat of great bodily harm or death is perceived.  In addition, DOC staff are only to use the

4    level of force necessary to control a situation.  Here, defendants have not alleged that use of a gun, or other

5    similar use of deadly force, was necessary to control the situation during the arrest of Mr. Allen or that a

6    threat of great bodily harm or death was perceived by defendant Shaver.  Indeed, defendant Shaver himself

7    states in his declaration that he had no reason to believe Mr. Allen would resist arrest or present a risk of

8    flight.  As such, if defendant Shaver did in fact take out his gun as plaintiffs allege, it is difficult to see that

9    an objective CCO would view such action as being reasonable in light of the express language of the DOC

10   directive noted above. See also Stough Declaration, ¶ 18.

11   Plaintiffs, however, have failed to come forth with a prior case that is closely analogous to the matter

12   at hand showing that Mr. Allen's right to be free from the type of use of force under facts similar to the ones

13   in this case was clearly established at the time of his arrest.  At first glance it might appear that defendant

14   Shaver's alleged use of deadly force, i.e., a gun, was unreasonable on its face under Graham.  That is, the

15   sentencing violation of which Mr. Allen was accused, though certainly not insignificant, was not one of

16   violence.  In addition, Mr. Allen did not pose an immediate threat to the safety of defendants Feld, Frice or

17   Shaver or to the safety of others, nor was he actively resisting or attempting to evade arrest.

18   Plaintiffs have pointed to no Supreme or Circuit court case, nor has the Court found any, holding

19   that drawing a gun and then briefly pointing it at the ground constitutes an excessive use of force, even

20   where, as here, there was no immediate threat to safety or active attempt to resist or evade arrest.  In the

21   Ninth Circuit, however, cases in which it has been found that the use of a gun by an officer constituted an

22   excessive use of force in such circumstances generally involved the situation where the officer had drawn

23   his gun and then aimed it at the plaintiff. See, e.g., Tekle v. United States, 457 F.3d 1088, 1095 (9th Cir.

24   2006) (gun pointed at head of non-resisting, unarmed eleven year-old boy lying face-down in driveway);

25   Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005) (weapon kept trained on infant); Robinson v. Solano

26

27

28   [16]The question of "reasonableness" in this instance is concerned solely with the issue of whether a constitutional violation, i.e., excessive use of force, had occurred.  It does not go to, and thus is entirely separate from, the next step in the qualified immunity analysis process, i.e., the issue of whether defendant Shaver's belief that his alleged use of force was reasonable.

1   Co., 278 F.3d 1007, 1013-15 (9th Cir. 2001) (gun drawn at close range and pointed at head of unarmed and

2   handcuffed suspect) (citing Petta v. Rivera, 143 F.3d 895, 905 (5th Cir. 1998) (cocked gun brandished in

3   front of civilian's face)).

4          When determining whether use of a gun by law enforcement officials is excessive, at least during an

5   investigatory stop, the courts "must look at the intrusiveness of all aspects of the incident in the aggregate."

6   Robinson, 278 F.3d at 1015.  The Ninth Circuit has stated that "[u]nder ordinary circumstances, when the

7   police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs

8   and other restraints will violate the Fourth Amendment." Washington v. Lambert, 98 F.3d 1181, 1187 (9th

9   Cir. 1996).  The Court of Appeals, however, made clear that in referring to "drawing weapons," it meant

10  "pointed" weapons:

11          [I]f the police draw their guns it greatly increases the seriousness of the stop. . . . The
           significance of the pointed gun is that it makes the encounter far more frightening than if
12         the officer's gun remains holstered, or even drawn but pointed down at his side; and
           certainly where the danger of the encounter to the officer, though potentially serious, is
13         not clear and present, the deliberate pointing of a gun at the suspect is problematic.

14  Id. at 1188-89 (emphasis added).  Accordingly, viewing the context of this case as a whole, and the facts in

15  the light most favorable to plaintiffs, it was not clearly established at the time of the events in question that

16  even if defendant Shaver had taken his gun out of his holster and briefly pointed it at the ground, this would

17  constitute an excessive use of force during the arrest of Mr. Allen.  Defendant Shaver is therefore entitled to

18  qualified immunity.

19  V.     Plaintiffs Lisa Allen, AA, CA and SA Cannot Assert a Claim Under the Fourteenth Amendment

20          Plaintiffs Lisa Allen, AA, CA and SA claim the defendants' actions deprived them of their "liberty

21  relationship with" Mr. Allen. Plaintiffs' First Amended Complaint, p. 2.  Defendants argue those plaintiffs

22  lack standing to sue for compensation under section 1983 for any injuries they allegedly suffered due to Mr.

23  Allen's claimed violation of his constitutional rights.  In response, plaintiffs assert there is a genuine issue

24  of material fact as to whether defendants' conduct violated the due process rights of Lisa Allen, AA, CA and

25  SA.  The Court, however, finds plaintiffs' argument to be without merit.

26          The "cause of action for deprivation of civil rights" created by section 1983 "is an action *personal*

27  to the injured party," as the language of the statute itself only "grants the cause of action 'to the party

28  injured.'" Jaco v. Bloechle, 739 F.2d 239, 241 (6th Cir. 1984) (emphasis in original); Estate of Amos v. City

    of Page, 257 F.3d 1086, 1093 (9th Cir. 2001) (party bringing discrimination action under section 1983 must

ORDER
Page - 29

assert own rights and interests, not those of third parties); Claybrook v. Birchwell, 199 F.3d 350, 357 (6th Cir. 2000) ("[A] section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort."). "Accordingly, only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim." Claybrook, 199 F.3d at 357. In other words, "no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." Id.

Thus, for example, federal courts have held that section 1983 "does not reach" the claim for loss of consortium made by the spouse of a plaintiff who brings a cause of action for violation of his or her civil rights, because such a claim "does not represent an injury based on a deprivation of" the spouse's "rights, privileges or immunities secured by federal law." Stallworth v. City of Cleveland, 893 F.2d 830, 838 (6th Cir. 1990); see also Meaney v. Dever, 170 F.Supp.2d 46, 64 (D.Mass. 2001) ("A spouse of a federal civil rights victim is not permitted to raise a separate ancillary cause of action for loss of consortium based solely upon the federal civil rights violation."), *reversed and remanded on other grounds by* Meaney v. Dever, 326 F.3d 283 (1st Cir. 2003); Quitmeyer v. Southeastern Pennsylvania Transp. Authority, 740 F.Supp. 363, 370 (E.D.Pa. 1990) (no authority to permit spousal recovery for loss of consortium based on violations of other spouse's civil rights).

While plaintiffs allege a violation of Lisa Allen's constitutionally protected due process rights, they do not identify, with any specificity, what those rights are. If plaintiffs are alleging loss of consortium with Mr. Allen for the short time he was in custody, such right is not recognized as it is collateral to Mr. Allen's section 1983 claim. Defendants therefore are entitled to an order dismissing plaintiffs' claim that there was a violation of Lisa Allen's federally protected constitutional rights.

Plaintiffs Lisa Allen, AA, CA and SA argue, however, that they are entitled to bring separate due process claims under the Fourteenth Amendment in light of the recognized inherent liberty interests in companionship between a parent and his or her children. To support their argument, plaintiffs rely on the Ninth Circuit's holding in Curnow v. Ridgecrest Police, 952 F.2d 321 (9th Cir. 1991), which involved a lawsuit brought under section 1983 by the estate, parents and children of an individual who was killed by a police officer using deadly force during the course of an arrest. Id. at 322-24. In that case, the Court of Appeals stated as follows:

1
2
3
4

> While the person who claims excessive force was directed at him or her can only raise a fourth amendment claim, a parent who claims loss of the companionship and society of his or her child, or vice versa, raises a different constitutional claim.  The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child, . . . and that a "child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." . . . Thus, *Graham v. Connor* does not bar the parents' and children's due process claims.

5
6
7
8
9

Id. at 325 (internal citations omitted).  Therefore, plaintiffs argue here, that while Lisa Allen, AA, CA and

SA themselves may not bring a claim for civil damages under section 1983 based on excessive use of force

under the Fourth Amendment, Curnow allows them to do so under the Fourteenth Amendment for loss of

companionship.

10
11
12
13
14
15
16
17
18

Clearly, as indicated by the Ninth Circuit's decision in Curnow, this appears to be true at least with

respect to the claims of plaintiffs AA, CA and SA.  The "constitutional interest in familial companionship

and society logically extends to protect children from unwarranted state interference with their relationships

with their parents." Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987).  Likewise, "parents can

challenge under section 1983 a state's severance of a parent-child relationship as interfering with their

liberty interests in the companionship and society of their children." Id.  It further appears though, that such

a right has not yet been extended to the relationship between husband and wife. See id. (noting that

Supreme Court has yet to address whether government's act of taking life of one family member deprives

every other family member of cognizable liberty interest in continued association with decedent).

19
20
21
22
23
24

Regardless, neither Lisa Allen nor any of the Allen children have demonstrated that there has been

any "unwarranted" state interference in their relationships with Mr. Allen on the part of defendants.  As

explained above, plaintiffs have failed to show the arrest of Mr. Allen was unlawful.  In addition, while

there is a dispute as to whether defendant Shaver drew his gun and whether the manner in which he did so

constituted excessive use of force, no showing has been made that such an alleged constitutional violation

actually interfered with any liberty interest here.

## CONCLUSION

25
26
27
28

Defendants have met their burden of demonstrating that they are entitled to judgment as a matter of

law on plaintiffs' federal claims brought pursuant to section 1983.  Specifically, plaintiff Trevor Allen has

failed to allege valid Fifth, Eighth and Fourteenth Amendment claims, plaintiffs' claims against the State of

Washington are barred by the Eleventh Amendment, defendants Shelley Feld, Jeff Frice and Anthony

1   Shaver are entitled to qualified immunity, and plaintiffs Lisa Allen, AA, CA and SA have failed to allege

2   valid substantive due process claims under the Fourteenth Amendment.  Accordingly, defendants' motion

3   for summary judgment (Dkt. #30) hereby is GRANTED, and plaintiffs' federal claims brought pursuant to

4   section 1983 hereby are DISMISSED.[17]

5        DATED this 24th day of October, 2006.

6

7

8                                        Karen L. Strombom
                                         United States Magistrate Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
_____

   [17]In addition, as noted above, plaintiffs' motion for a continuance of the noting date for consideration of defendants'
motion for summary judgment (Dkt. #32) hereby is GRANTED.

ORDER
Page - 32