UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DR. TREVOR ALLEN and LISA ALLEN,
husband and wife, individually and as the
natural parents and guardians of AA, CA, and
SA, minor children,

                Plaintiffs,

        v.

THE STATE OF WASHINGTON, SHELLEY
FELD, JEFFREY S. FRICE, and ANTHONY
T. SHAVER, natural persons in their
individual and official capacity as employees
of the State of Washington, and John and Jane
Does 1 through 25, in their individual and
official capacities as unidentified employees of
the State of Washington,

                Defendants.

Case No.  C05-5502KLS

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON
PLAINTIFFS' STATE LAW
CLAIMS AND DISMISSING
COMPLAINT

This matter comes before the Court on defendants' motion for summary judgment on the state law claims brought by plaintiffs in their first amended complaint. (Dkt. #41).  The Court already has dismissed the federal claims contained therein brought by plaintiffs pursuant to 42 U.S.C. § 1983. (Dkt. #55).  The parties have consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Magistrates Rule 13.  Having reviewed defendants' motion, plaintiffs' response to that motion, defendants' reply thereto, and the remaining record,

1    the Court hereby finds and orders as follows.

2                    FACTUAL AND PROCEDURAL BACKGROUND

3           In addition to the claims of civil rights violations brought pursuant to 42 U.S.C. § 1983 dismissed

4    previously, this case also concerns certain state tort law claims, including the torts of outrage, negligent

5    infliction of emotional distress and negligent hiring and supervision, of which defendants' current motion

6    for summary judgment and this Order are concerned. Plaintiffs' First Amended Complaint, pp. 2-4 (Dkt.

7    #29).  The relevant facts and procedural background of this case, as were set forth in the Court's previous

8    order dismissing plaintiffs' federal claims, are as follows.

9    A.     Mr. Allen's Conviction and Sentence

10          Plaintiff, Trevor Allen, was found guilty of the crime of voyeurism in the Superior Court of the State

11   of Washington, County of Clark, on August 11, 2000. Declaration of Shelley Feld ("Feld Declaration"),

12   Exhibit A.  According to the State of Washington Department of Corrections ("DOC") pre-sentence

13   investigation report, in late January, 2000, Mr. Allen entered a neighbor's yard, went to what he "assumed

14   was the bathroom window" in the "'hopes of seeing something,'" "looked through the window," and

15   "observed a woman in a robe who appeared to be getting ready." Id., Exhibit D.  Mr. Allen also apparently

16   "related he had done this [sort of thing at that house] no more than two times before." Id.

17          Mr. Allen was sentenced to a total of 107 days in custodial confinement, with credit received for

18   103 days of home confinement, 400 hours of community service, and 36 months of community supervision.

19   Feld Declaration, ¶ 6 and Exhibit C.  The community supervision portion of his sentence began on

20   November 25, 2000, and included the following conditions: (a) that he "not commit any like offenses"; (b)

21   that he "not possess or use any pornographic material or equipment of any kind," and "not frequent

22   establishments that provide such materials for view or sale"; and (c) at least twice a year he submit to

23   polygraph examinations at the request of his community corrections officer ("CCO") and/or the prosecuting

24   attorney. Feld Declaration, ¶ 6 and Exhibits A and C.  The purpose of the polygraph examinations were to

25   ensure compliance with the conditions of Mr. Allen's community supervision, and the results thereof could

26   then be used by the state in any community supervision revocation hearings. Id.

27          B.     Mr. Allen's Polygraph Examination

28          Mr. Allen underwent a polygraph examination performed by Ron W. Yunck on October 8, 2003. Id.,

Exhibit F.  During a "pre-test interview" conducted prior to the actual examination, Mr. Allen advised Mr.

Yunck of the following:

> I did the following things wrong when I was at the above residence(s):
>
> Looked at pornography on the computer – last time = 1 month ago – I was alone at the time – looking at still pictures of naked adult females showing their breasts – before I saw this on the computer I had seen an advertisement on the side of a truck (weightless sex.com) and I was curious – then when I got home I got on the computer and looked it up – once I got into the site I entered two pages – I was on the site one minute – I did not masturbate and not have sexual contact with anyone at the time and not shortly afterwards – this is the only time I have looked at pornography on my home computer[.]
>
> Peeped on my neighbor Suzie - Age 40s – last time = July or August 2003 – I was alone at the time – I was in the upstairs part of my house – peeping through her bedroom window – this was daylight – I saw her in her pajamas – this was in the morning and she was reading the newspaper – her pajamas were more like a long shirt and shorts – I peeped on her for about 2 minutes – I was dressed at the time – I did not expose to her, not try to and not think about it – I did not masturbate and not have sexual contact with anyone at the time and not shortly afterwards – this was the only time I have peeped on her and the only time I have attempted to peep on her – I have not peeped and not attempted to peep on any other neighbor – to me it was not a peeping experience to me – I realized where my mind was going and I got away before it becaming [sic] a peeping experience[.]

Id., question #002.

Mr. Yunck reported that when later questioned during the pre-test interview as to whether he had

looked at anything on or from a computer that was sexual, had attempted to deliberately peep on anyone, or

had peeped on anyone through a window, crack of the door, hole in the wall or while pretending to sleep,

Mr. Allen gave the following answers: "yes" and "refer [sic] prior questions." Id., question #020, #029-

#030.  When asked whether he had deliberately disobeyed his probation officer or therapist and committed

probation or therapy violations, furthermore, Mr. Yunck reported Mr. Allen stated as follows:

> Refer [sic] prior questions &
>
> Scan TV for the sexual things – last time = 1 week ago – I was at home – I was alone at the time – I did not find anything sexual to me and I have scanned 3-4 times total since my last test scanning for sexual things but did not find anything sexual[.]

Id., question #006.  In addition, at the end of the pre-test interview, Mr. Yunck reported that in answer to

the question as to what was the most serious thing he had done, Mr. Allen stated: "looking at the

pornography site on the internet." Id., question #061.

On the other hand, Mr. Yunck reported that Mr. Allen answered "no" to the question as to whether

he had reported everything to his counselor or probation officer, explaining as follows: "I did not tell them

about peeping on my neighbor – the real reason why I did not tell them about this === I did not think it was

peeping." <u>Id.</u>, question #54.  Mr. Yunck further reported that when asked what he had been "seriously tempted" to, but did not, do, Mr. Allen replied: "scan for sexual things on the computer." <u>Id.</u>, question #56. Mr. Yunck also reported that Mr. Allen answered "no" when asked whether he deliberately broke the law or did anything else when he knew it was wrong to do so. <u>Id.</u>, question #007-#008.

On the polygraph examination itself, Mr. Allen once more answered "no" to the following questions: (1) "Since your last test, have you had sexual contact with a minor child?"; (2) "Since your last test, have you deliberately peeped on anyone else?"; and (3) "Since your last test, have you been involved in any other illegal sexual activity?" Feld Declaration, Exhibit F.  Mr. Yunck, again opined that, "[b]ased on the psychological responses" produced during the polygraph examination, Mr. Allen was not "attempting deception" in his answers to the above three questions. <u>Id.</u>

C.     <u>Disputed Facts Regarding the Polygraph Examination</u>

In his declaration, Mr. Allen states that during the October 8, 2003 polygraph examination, he told Mr. Yunck that "on one occasion while in the upstairs bedroom" of his home, he saw his neighbor "sitting in her backyard reading a newspaper," that she was wearing pajamas which "covered her completely," and that those pajamas "were not revealing or provocative in any way." Declaration of Trevor Allen ("Allen Declaration"), ¶ 9 (Dkt. #37).  Mr. Allen further states that he told Mr. Yunck that he "looked at her for a short period of time," that he could "sense" his "mind was beginning to skip to a dangerous place," and that he thus "quit looking" and "walked away." <u>Id.</u>

According to Mr. Allen, he "never used the term 'peep' or 'peeping' or 'peeped' while describing this incident to Mr. Yunck." <u>Id.</u>, ¶ 10.  He states that at one point during the pre-test interview, he asked Mr. Yunck "to read back" him "a summary" of the "conversation where he used those terms," and "told him that it was not a 'peeping' incident" and that he "did not agree with the use of those terms." <u>Id.</u>  In his own deposition for this case, Mr. Yunck testified that he could not remember specifically without looking at the polygraph examination report whether Mr. Allen had used those terms. Plaintiffs' Statement of Material Facts ("Plaintiffs' Statement"), Exhibit Q (Dkt. #34).

With respect to the issue of accessing pornography on his computer, Mr. Allen states that he told Mr. Yunck he "tried to access it," but then he "stopped immediately" when he "realized" he was "crossing over into dangerous and inappropriate conduct." Allen Declaration, ¶ 11.  Mr. Allen further states that he "did not view pornography" on his computer, nor did he tell Mr. Yunck that he had done so. <u>Id.</u>, ¶ 13.

Mr. Allen states that he "did not see Mr. Yunck's transcript of the pretest interview until" after he was arrested for alleged violations of his conditions of community supervision, as set forth below,[1] and that "[t]he only signature" he provided "was before the interview began," which was on a "Statement of Consent" authorizing the release of information contained in his polygraph examination and holding Mr. Yunck and his company "harmless and free from any liability." Id., ¶ 14; see also Feld Declaration, Exhibit F. In his deposition testimony, Mr. Yunck himself confirmed that the above "Statement of Consent" merely allowed him to give Mr. Allen the polygraph examination and let Mr. Allen know to whom his information could be released. Plaintiffs' Statement, Exhibit P.

Mr. Yunck testified that the "Statement of Consent" is presented to the individual being examined before the actual polygraph examination is administered. Id., ¶ P. He further testified that the transcript of the pre-test interview is not reviewed with the individual being examined prior to sending it to the DOC. Id., ¶ R. With respect to Mr. Allen's own polygraph examination, Mr. Yunck testified that Mr. Allen's signing of the "Statement of Consent" did not "in any way" constitute an acknowledgment that Mr. Allen agreed with "the accuracy of the pretest interview," nor did Mr. Yunck tell anyone at the DOC that Mr. Allen's signing could be interpreted as such. Id. Mr. Yunck also testified that he did not provide Mr. Allen with a copy of the pre-test interview transcript. Id.

D.   Mr. Allen's Arrest

In her declaration, defendant Shelley Feld states that she was Mr. Allen's CCO from July 24, 2003, until December 18, 2003. Feld Declaration, ¶ 7. She states that so as "to enforce the terms and conditions" of Mr. Allen's sentence, she "read records in the DOC file," the reports of his counselor, the DOC's pre-sentence investigation report, and "the polygraph examiner's reports," and "read and became familiar with" Mr. Allen's "criminal history and supervised him accordingly," and Id., ¶¶ 7-8.

Defendant Feld states that on October 13, 2003, she received a copy of Mr. Yunck's October 8, 2003 polygraph examination report. Id., ¶ 9. She states that the purpose of the pre-test interview questions posed to Mr. Allen "is to see if the offender discloses conduct that may violate his sentence," which should then "be provided to the sentencing court." Id., ¶ 10. She notes that in response to the questions as to whether he had deliberately disobeyed his probation officer or therapist, had committed probation or

---

[1]Mr. Allen does further state, however, that "[o]n the one or two occasions where" Mr. Yunck "went over the transcript with me, I made corrections," but it appeared Mr. Yunck "never made them in the transcript itself." Id., ¶ 14.

therapy violations, and had attempted to deliberately peep on anyone, Mr. Allen answered as follows: "yes" and "refer [sic] prior questions." <u>Id.</u>, ¶ 11.  In answer to the question as to what was the most serious thing he had done, she further notes plaintiff responded with: "Looking at the pornography site on the internet." <u>Id.</u>

Defendant Feld states that she then conferred with her supervisor, defendant Jeff Frice, on October 17, 2003, a Friday. <u>Id.</u>, ¶ 12.  They both concluded that Mr. Allen "had admitted [in his pre-test interview] that he had engaged in conduct similar to the conduct for which he was sentenced and which violated the terms and conditions of his sentence," and that those "admissions" had "created a reasonable suspicion" that he "had violated his sentence." <u>Id.</u>, ¶ 12.

In her deposition for this case, defendant Feld testified that she did not personally speak with Mr. Yunck about Mr. Allen's polygraph examination before going to arrest Mr. Allen. Plaintiffs' Statement, Exhibit H.  She testified that while she understood there was a difference between a pre-test interview and the actual polygraph examination itself, she did not know how the process worked, nor had she ever received any specific training with respect thereto. <u>Id.</u>  Defendant Feld further testified that she "made the decision to make an arrest," because "it was on a Friday," and because:

> [C]onsidering the violations -- or allegations that were being presented to me through the polygraph examination, I felt that he needed to be taken into custody immediately for community safety to avoid any possible -- any future criminal behavior, violation behavior.

<u>Id.</u>, Exhibit L.

In his declaration, defendant Frice states that Mr. Allen had been classified by the DOC as "a high risk offender, the second most likely to reoffend." Declaration of Jeff Frice ("Frice Declaration"), ¶ 3.  He states that on October 17, 2003, defendant Feld came into his office with Mr. Allen's October 8, 2003 polygraph report. <u>Id.</u>, ¶ 6.  As did defendant Feld, defendant Frice states that in that report Mr. Allen "admitted that he had engaged in conduct that" was "prohibited by his judgment and sentence," and that "[i]n response to direct questions he admitted that he had deliberately peeped on a neighbor and that he had used a computer to access online pornography." <u>Id.</u>

Also as did defendant Feld, defendant Frice felt "[t]hese admissions in the October 8 pre-polygraph interview create[d] a reasonable suspicion that" Mr. Allen "was in violation of his judgment and sentence." <u>Id.</u>, ¶ 7.  In his deposition for this case, however, defendant Frice testified that he based his belief that Mr.

Allen committed a violation of his judgment and sentence both on the statements that were attributed to him in the pre-test interview report, and on Mr. Allen signing the report "saying that he agreed with what was in there." Plaintiffs' Statement, Exhibit B.  Defendant Frice further testified that he did not contact Mr. Allen's therapist or read any of his reports prior to deciding to arrest Mr. Allen. Id., Exhibit F.

As noted above, defendant Feld states in her declaration that because "[i]t was Friday afternoon," she and defendant Frice decided Mr. Allen "should be brought into custody and brought before the sentencing court for a violation hearing." Feld Declaration, ¶ 12.  In his declaration, defendant Frice further elaborated why he decided Mr. Allen should be taken into custody:

> I determined that Allen should be taken into custody because his answers during the polygraph interview led me to believe that he presented a significant risk to public safety. I want to prevent new criminal behavior and protect potential victims.  If Allen remained at large and committed a new offense, the DOC would be liable for any injury caused by Allen from the moment that DOC became aware of his potential to reoffend.  My decision to arrest Allen was based on DOC's obligation to protect public safety and DOC's duty to present this information to the sentencing court so that the court could decide whether to reincarcerate Allen or impose a lesser sanction.

Frice Declaration, ¶ 8.

Defendant Frice also determined that Mr. Allen's computer should be "seized and searched for evidence of a parole violation," and that he should not be asked to report to DOC voluntarily, because that "would have given him the opportunity to erase evidence from the computer or conceal the computer." Id., ¶ 11. To that end, defendant Frice directed defendant Feld "to write an order for arrest and detention, a notice of violation, and to take" Mr. Allen "into custody." Id., ¶ 7.  In addition, it was the impression of defendant Tony Shaver, who, as explained below, participated in the arrest of Mr. Allen, that defendant Frice "wanted to make sure that this arrest was done," and that "he did not want" defendant Feld "talked out of it" by Mr. Allen. Plaintiffs' Statement, Exhibit U.

Defendants Feld and Frice "recruited a team of four DOC personnel," including both themselves and defendant Shaver. Feld Declaration, ¶ 13; Frice Declaration, ¶ 9.  Defendant Feld states that she contacted the local police department and asked them for assistance. Feld Declaration, ¶ 13.  The four DOC personnel, along with three local police officers who had "joined the arrest team," then drove to Mr. Allen's house. Id.  According to defendants Feld and Frice, "[i]t is standard operating procedure to take more than one [DOC] officer to arrest an offender in the community," and to "ask for assistance from local law enforcement if time and resources permit." Id.; Frice Declaration, ¶ 9.

1       Defendant Feld states that she previously had not been to Mr. Allen's house. Feld Declaration, ¶ 14.

2  Prior to going there, defendants Feld and Shaver "were assigned to enter and arrest" Mr. Allen. Id.; Frice

3  Declaration, ¶ 10.  They went to the front door and knocked. Feld Declaration, ¶ 14; Declaration of Anthony

4  Shaver ("Shaver Declaration"), ¶ 5.  The door was opened by a young girl, who turned out to be Mr. Allen's

5  daughter, plaintiff AA. Id.  Defendant Feld asked plaintiff AA if her father was at home, and she responded

6  that he was upstairs and asked if she should go get him. Id.

7       Defendants Feld and Shaver then entered the house, and defendant Feld announced themselves by

8  stating: "Department of Corrections." Feld Declaration, ¶ 14; Shaver Declaration, ¶ 6.  Defendant Shaver

9  "noticed a stairway to the right," and "moved ahead" of both defendant Feld and plaintiff AA. Shaver

10  Declaration, ¶ 6.  Defendant Shaver "went up the stairs," and defendant Feld followed behind him. Id.  At

11  the top of the stairs, they saw Mr. Allen "at the far end" of a narrow hallway. Feld Declaration, ¶ 15; Shaver

12  Declaration, ¶ 7.  Both defendants state that defendant Shaver told Mr. Allen he was under "under arrest"

13  and directed him "to turn around and put his hands behind his back." Id.

14       According to defendant Shaver, Mr. Allen asked him "why," and he responded by repeating his

15  "instructions two or three times." Shaver Declaration, ¶ 7.  Mr. Allen then "complied by turning around in

16  place and putting his hands behind his back." Id.; Feld Declaration, ¶15.  Defendant Shaver then

17  approached Mr. Allen, placed him in handcuffs, escorted him downstairs, and "took him to a chair on the

18  front porch." Feld Declaration, ¶ 15; Shaver Declaration, ¶¶ 7-8.  Defendant Feld then transported Mr. Allen

19  to the Clark County jail, "where he was booked and held for the weekend." Feld Declaration, ¶ 16.

20       Defendant Shaver states that during the arrest of Mr. Allen, he "was wearing a DOC issued handgun

21  in a holster on his right side," which was "not concealed." Shaver Declaration, ¶ 4.  According to a DOC

22  policy directive, DOC "[s]taff who choose to carry firearms shall carry their firearms at all times while in the

23  performance of their official field duties," "[f]irearms shall not be used to effect an arrest" unless the CCO

24  "perceives a threat of great bodily harm or death," and DOC "[s]taff shall only use the level of force that is

25  necessary to control a situation." Id.; see also Plaintiffs' Statement, Exhibit CC, Field Directive re: Firearms,

26  DOC 200.460.

27       Defendant Shaver states that "[b]efore, during and after the arrest," he "had no reason to believe

28  that" Mr. Allen "would resist arrest or present a risk of flight." Shaver Declaration, ¶ 5.  He further states

that he "did not use any force" in arresting Mr. Allen, that he "did not need to use any force" to do so, and

that he "did not unholster" his weapon "during the arrest." Id., ¶ 9. In his declaration, defendant Frice also states that "[a]t no time during the whole arrest was any force used," nor did Mr. Allen "complain about any force having been used or about any weapon being drawn." Frice Declaration, ¶ 12.

Defendant Feld testified in her deposition that to the extent that defendant Shaver "was out of" her "line of sight at any given time" when they went upstairs to arrest Mr. Allen, it might "have only been a few seconds." Plaintiffs' Statement, Exhibit M. However, defendant Feld testified that at no time did she see defendant Shaver take his gun out of his holster. Id. While defendant Feld did not recall if defendant Shaver at any time put his hand on his gun, she testified he could have done so. Id. In her declaration though, she again states that she was "directly behind" defendant Shaver, that "[a]t no time did" she "observe any force being used" or "any weapon drawn" by him, and that if he "had drawn his weapon," she "would have seen it." Feld Declaration, ¶ 19.

Defendant Feld did not remember if plaintiff AA was behind her or in front of her when they went up the stairs. Plaintiffs' Statement, Exhibit M. In her own deposition for this case, plaintiff AA testified that after she "walked a few steps into the [upstairs] hallway . . . [o]ne of the men in uniform walked" past her and arrested her father. Id., Exhibit X. She further testified that this man had followed her up the stairs. Id. However, she also testified that she never saw anyone with a gun in his or her hand, and that, while she did see a gun that day, it was in the "pocket" of the man who had followed her up the stairs. Id.

In his declaration, Mr. Allen states that as he was standing outside of his bedroom at the end of the upstairs hallway talking to his wife, he saw plaintiff AA in the hallway and "a large man" behind her, who turned out to be defendant Shaver. Allen Declaration, ¶ 20-21. Mr. Allen states that defendant Shaver was "holding a pistol" in his right hand, and that he "was holding it down and partially behind" plaintiff AA. Id., ¶ 21. Mr. Allen further states that although "[i]t was hidden somewhat, . . . there was no doubt" in his mind "that he had a gun in his hand." Id., ¶ 21.

Mr. Allen states that he "heard someone yell something about 'Department of Corrections!,'" and that defendant Shaver was "yelling orders" at him "to turn around and put" his hands behind his back. Id. Mr. Allen states that as he "began to comply with his orders," he saw defendant Shaver "put his gun in the holster, grab the handcuffs, and move around" plaintiff AA "to her right." Id. As related by defendants Feld and Shaver above, Mr. Allen states that he then was handcuffed by defendant Shaver, taken downstairs by him, and brought outside to sit on his front porch. Id. He states that he was transported to the Clark County

1    Jail, where he "was held until the following Thursday," October, 23, 2003. Id., ¶ 22.

2        E.    Mr. Allen's Violation Hearing

3        On October 23, 2003, defendant Feld filed a "Notice of Violation" report with the Clark County

4    Superior Court, in which she stated that Mr. Allen's period of community supervision was due to terminate

5    on November 22, 2003, but that he had violated the conditions of his supervision by: (1) "[c]ommitting a

6    like offense by peeping at a neighbor sometime during the months of July and/or August as disclosed in the

7    polygraph on 10/08/03"; and (2) "[v]iewing pornography as disclosed in the polygraph on 10/08/03." Feld

8    Declaration, Exhibit G, p. 1.  That report also had been "[a]pproved" by defendant Frice prior to its filing

9    with the Clark County Superior Court. Id., p. 3.

10        Defendant Feld stated in the violation report that Mr. Allen had disclosed during his October 8,

11    2003 polygraph examination that while he "did not believe" he was "peeping" when he watched his

12    neighbor "for approximately two minutes" in July and/or August 2003, he "admitted that he was aware of

13    where his mind was going during the incident." Id., p. 2.  Defendant Feld also stated that Mr. Allen's

14    "original offense of voyeurism involved similar behaviors of watching neighbors in their home." Id.

15        In addition, defendant Feld stated that Mr. Allen also had disclosed in his polygraph examination

16    that he "had looked at pornography on the computer." Id.  She stated, furthermore, that a forensic analysis of

17    Mr. Allen's computer revealed that he viewed a website called weightlesssex.com "for approximately two

18    minutes," which was "mirrored with another website, bungeesex.com, which it would appear that" he had

19    "typed in" that web address in order to go there. Id.

20        Defendant Feld concluded her report as follows:

21        Allen has been on supervision for 35 months.  He has complied with specific conditions
        regarding reporting and attending treatment.  In fact he will be completed with treatment
22        before his supervision ends in November 2003.  On the surface it would appear that
        Allen has done well on supervision, however these recent disclosures during his
23        polygraph are a concern for the Department of Corrections.  Allen has self-reported these
        behaviors and it appears that he is recognizing that these behaviors are not appropriate.
24        Nonetheless, these behaviors indicate that Allen is possibly in a pattern of behaviors that
        could result in a new victim.  In his polygraph on 05/27/03,[2] Allen disclosed that he had
25        fantasized about past peeping episodes.  During both the polygraphs on 05/27/03, and the
        more recent one conducted on 10/08/03, Allen disclosed that he had scanned the
26        television for sexually explicit material on several occasions.  All these high-risk
        behaviors are violations of Allen's conditions of supervision, and can lead to his
27        committing another offense.

28
        _____
        [2]This polygraph is not contained in the record before the Court.

ORDER
Page - 10

Id. She recommended Mr. Allen serve "10 days per violation for a total of 20 days jail." Id., p. 3.

A violation hearing before the Clark County Superior Court was set for December 18, 2003. Feld Declaration, ¶ 17. In the meantime, Mr. Allen was released on his own recognizance without bail. Id. It appears the prosecuting attorney also decided to dismiss the violation regarding Mr. Allen's alleged use of his computer to view pornography, because the forensic analysis of the computer discussed above showed that he "had tried to access" the websites weightlessex.com and bungeesex.com, but his "internet service provider blocked access beyond the home page of each site."[3] Frice Declaration, ¶ 13; Feld Declaration, ¶ 18; Plaintiffs' Statement, Exhibit Z.

At the violation hearing, the Clark County Superior Court determined Mr. Allen "had not engaged in any new voyeurism conduct and dismissed the voyeurism violation," and it released him "immediately from further [community] supervision." Feld Declaration, ¶ 18 and Exhibit H; Allen Declaration, ¶ 23. The trial court's decision appears to have been based on evidence Mr. Allen's attorney presented to the court "during a private conference," indicating that it was "not possible for anyone to see inside the neighbor's bedroom from the Allen's residence." Feld Declaration, ¶ 18; Plaintiffs' Statement, Exhibit AA. Mr. Allen further states that during the hearing, the trial court "expressed concern" to defendant Feld "about the amount of force that was used in arresting" him. Allen Declaration, ¶ 23.

F.   Procedural History in This Case

Defendants filed their motion for summary judgment on plaintiffs' section 1983 claims on July 18, 2006 (Dkt. #30), which the Court granted on October 24, 2006, thereby dismissing those claims. (Dkt. #55). Defendants' filed their motion to dismiss plaintiffs' remaining state law claims on August 25, 2006. (Dkt. #41). While that motion originally was noted to be considered on September 22, 2006, it later was re-noted for consideration on October 20, 2006. (Dkt. #47). In their current motion, defendants argue the facts of this case do not support plaintiffs' state law claims of outrage, negligent infliction of emotional distress or negligent hiring and supervision. In response, plaintiffs' argue not only are there genuine issues of material fact with respect to each of those claims, but they also adequately have pled the claims of negligence, false arrest and false imprisonment. (Dkt. #53). Defendants have filed a reply thereto. (Dkt. #54). As such, their

---

[3]The Court notes though that the attempted access identified through the forensic analysis occurred on October 13, 2003, some five days after the polygraph was administered. Plaintiffs' Statement, Exhibit Z.

1    motion for summary judgment on plaintiffs' state law claims is now ripe for consideration.

2    <u>DISCUSSION</u>

3    I.    <u>Standard of Review</u>

4    Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no

5    genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

6    Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c).  In deciding whether summary judgment should

7    be granted, the Court must view the record in the light most favorable to the nonmoving party and indulge

8    all inferences favorable to that party. Fed. R. Civ. P. 56(c) and (e).  When a summary judgment motion is

9    supported as provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or

10    denials of his or her pleading, but that party's response, by affidavits or as otherwise provided in Fed. R.

11    Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  If

12    the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that

13    party. <u>Id</u>.

14    The moving party must demonstrate the absence of a genuine issue of fact for trial.  <u>Anderson v.</u>

15    <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).  Mere disagreement or the bald assertion that a genuine

16    issue of material fact exists does not preclude summary judgment.  <u>California Architectural Building</u>

17    <u>Products, Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).  A "material" fact is one

18    which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the

19    suit," and the materiality of which is "determined by the substantive law governing the claim." <u>T.W.</u>

20    <u>Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

21    Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of

22    summary judgment." <u>Id</u>.  Rather, the nonmoving party "must produce at least some 'significant probative

23    evidence tending to support the complaint.'" <u>Id</u>. (quoting <u>Anderson</u>, 477 U.S. at 290); <u>see also</u> <u>California</u>

24    <u>Architectural Building Products, Inc.</u>, 818 F.2d at 1468 ("No longer can it be argued that any disagreement

25    about a material issue of fact precludes the use of summary judgment.").  In other words, the purpose of

26    summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory

27    allegations of an affidavit." <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 888 (1990).

28    II.    <u>The Court's Supplemental Jurisdiction over Plaintiffs' State Law Claims</u>

In cases where "there is no independent basis for federal jurisdiction," that is, where the federal

1    claims are "absolutely devoid of merit or obviously frivolous," supplemental jurisdiction does not attach.

2    Brady v. Brown, 51 F.3d 810, 816 (9th Cir. 1995) (citation omitted); Hunter v. United Van Lines, 746 F.2d

3    635, 649 (9th Cir. 1985) (federal court's jurisdiction over state-law claim is entirely derivative of its

4    jurisdiction over federal claim).  On the other hand, where this is not the case, "[t]he decision to retain

5    jurisdiction over state law claims" is entirely "within the district court's discretion," even where the federal

6    claims ultimately are dismissed. Brady, 51 F.3d at 816; see also United Mine Workers of America v. Gibbs,

7    383 U.S. 715, 726 (1966).

8            Here, although plaintiff did not prevail on his federal civil rights claims, the Court cannot say they

9    were absolutely devoid of merit or obviously frivolous.  In addition to the requirement that there be "a

10   sufficiently substantial federal claim," however, for supplemental jurisdiction to apply, there also must be "a

11   common nucleus of operative fact between the state and federal claims." Gilder v. PGA Tour, Inc., 936

12   F.2d 417, 421 (9th Cir. 1991).  This second requirement also is present, as plaintiffs' state law claims

13   clearly arise from the same common nucleus of operative facts.  That is, they, as with the federal claims,

14   stem from the arrest of Mr. Allen and the events surrounding that arrest.

15           In weighing whether to retain jurisdiction over plaintiff's state law claims against the above named

16   defendants, furthermore, the district court weighs "factors such as economy, convenience, fairness, and

17   comity." Brady, 51 F.3d at 816.  Here, those factors again weigh in favor of retaining jurisdiction over

18   plaintiffs' state law claims.  First, dismissal of those claims at this late stage of the proceedings would be

19   inappropriate, even though plaintiffs' federal claims were dismissed prior to trial. Gibbs, 383 U.S. at 726.

20   Second, plaintiffs' state law claims do not "substantially predominate" this case. Id. at 726-27.  As such,

21   the Court finds it appropriate to exercise its supplemental jurisdiction here.  However, for the reasons set

22   forth below, the Court also finds each of plaintiffs' state law claims should be dismissed.

23   III.     Plaintiff's Claim of Outrage

24           In Washington, "[t]he basic elements of the tort of outrage are: '(1) extreme and outrageous conduct;

25   (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe

26   emotional distress.'" Dicomes v. State, 113 Wn.2d 612, 630 (1989) (citation omitted).  In addition, "[t]he

27   conduct must be '*so outrageous in character, and so extreme in degree, as to go beyond all possible*

28   *bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community*.'" Id.

     (citing Grimsby v. Samson, 85 Wn.2d 52, 59 (1975)) (emphasis in original).  As such, liability in this area

1  "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

2  Grimsby, 85 Wn.2d at 59 (citing Restatement (Second) Torts § 46, Comment D).  Rather, "plaintiffs must

3  necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." Id.

4       While "[t]he question of whether certain conduct is ordinarily for the jury, . . . it is initially for the

5  court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to

6  result in liability." Dicomes, 113 Wn.2d at 630.  In their complaint, plaintiffs essentially paraphrase the

7  Dicomes court's definition of the tort of outrage by claiming the conduct of defendants Feld, Frice and

8  Shaver in arresting Mr. Allen "was so outrageous in character and so extreme in degree as to go beyond all

9  possible bounds of decency and be regarded as atrocious and intolerable in a civilized community."

10 Plaintiffs' First Amended Complaint, ¶ 9.  This conduct, they therefore allege, intentionally caused them

11 severe emotional distress. Id. at ¶ 5.  The Court, however, finds no reasonable mind could find that

12 defendants' conduct was so extreme as to result in liability under this legal theory.

13      First, as found in the Court's previous order dismissing plaintiffs' federal civil rights claims, all

14 three defendants were found to have reasonable cause for arresting Mr. Allen.  Under Washington statutory

15 law: "[i]f there is reasonable cause to believe that an offender has violated a condition or requirement of the

16 sentence, an offender may be required to submit to a search and seizure of the offender's person, residence,

17 automobile, or other personal property." RCW 9.94A.631; see also RCW 9.94A.740(1).  Such a search and

18 seizure is reasonable where the law enforcement official has "a well-founded suspicion that a violation has

19 occurred." State v. Massey, 81 Wn. App. 198, 200 (1986); see also State v. Lucas, 56 Wn. App. 236, 243

20 (1989).  Because defendants' search and seizure of Mr. Allen was based on such a well-founded suspicion,

21 the Court found that search and seizure did not violate his Fourth Amendment rights.

22      Given that defendants had reasonable cause to arrest Mr. Allen and properly did so, the Court finds

23 no basis for determining their conduct in arresting him to have been either extreme or outrageous.  Further,

24 while the Court noted in its previous order that there was a question as to whether it was an unreasonable

25 use of force for defendant Shaver to have briefly drawn his gun, pointed it at the floor and partially behind

26 plaintiff AA, and then holster it again prior to arresting Mr. Allen, as alleged by plaintiffs, no showing has

27 been made that such conduct was so outrageous in character, extreme in degree, and atrocious, as to go

28 beyond all possible bounds of decency and to be utterly intolerable in a civilized community. See Dicomes,

113 Wn.2d at 630.  Indeed, plaintiffs were unable to show that Mr. Allen had a clearly established right not

ORDER
Page - 14

1  to be subjected to defendant Shaver's alleged actions in drawing his gun.

2      Second, plaintiffs have not demonstrated that any of the three defendants intended to, or recklessly

3  inflicted, emotional distress on any of the plaintiffs.  Again, the facts show all three defendants reasonably

4  acted in arresting Mr. Allen.  Nothing indicates any intent on their part to emotionally harm plaintiffs, or

5  even that their behavior was reckless.  Even with respect to defendant Shaver's alleged use of his gun

6  during the arrest, plaintiffs admit that it was only briefly withdrawn, that it was pointed at the ground at all

7  times, and that it was holstered prior to Mr. Allen being handcuffed.[4]  Finally, no facts have been presented

8  to the Court to show that the actual result of any of the defendants' actions was severe emotional distress to

9  any of the plaintiffs.  Accordingly, the Court finds plaintiffs' claim of outrage is not supported.

10  IV.    Plaintiff's Claim of Negligent Infliction of Emotional Distress

11      Washington courts have described the tort of negligent infliction of emotional distress as "a limited,

12  judicially-created cause of action that allows bystander family members to obtain damages for 'foreseeable'

13  intangible injuries caused by viewing a physically-injured loved one shortly after a traumatic accident."

14  Colbert v. Moomba Sports, Inc., 132 Wn. App. 916, 923 (2006) (citing Hegel v. McMahon, 136 Wn.2d

15  122, 125-26 (1998) and Gain v. Carroll Mill Co., 114 Wn.2d 254, 261 (1990)).  To sustain such an action,

16  "a plaintiff must first prove the four elements of negligence: duty, breach, cause, and damage." Id. at 925.

17  But, as implied by the above statement, while a defendant has "a duty to avoid the negligent infliction of

18  mental distress," it is "not every negligent act that causes harm" which will result "in legal liability for

19  emotional distress." Gain, 114 Wn.2d at 257; Colbert, 132 Wn. App. At 925 (citing Hunsley v. Giard, 87

20  Wn.2d 424, 434 (1976)).

21      Most importantly for purposes of plaintiffs' claim here, so as "[t]o limit the scope of liability in

22  cases involving bystanders' emotional harm," first, a defendant "owes a duty to only 'foreseeable

23  plaintiffs,'" and second, plaintiffs "must experience emotional distress with objective symptoms." Colbert,

24  132 Wn. App. at 925-26.  With respect to the first requirement, if "a defendant causes bodily injury to a

25

26      [4]Although, as discussed in the Court's previous order, the DOC policy directive governing use of firearms by DOC staff
    might bear on the issue of the reasonableness of defendant Shaver's alleged use of his gun during the arrest of Mr. Allen, and thus
27  whether he may have been negligent with respect thereto, plaintiffs still have not shown defendant Shaver intended to inflict, or
    was reckless in regard to inflicting, severe emotional distress on them. See Joyce v. State, 155 Wn.2d 306, 323-24 (2005)
28  ("[I]nternal policies and directives generally do not create law. . . . Internal directives, department policies, and the like may
    provide evidence of the standard of care and therefore be evidence of negligence."). Nor, as explained below, have plaintiffs
    sufficiently plead a claim of general negligence, let alone met the requirements for proving such a claim.

1    person, a foreseeable plaintiff includes the injured person's family members who are physically present at

2    the scene of an accident or who arrive 'shortly thereafter.'" <u>Id.</u> at 926.  Further, "not only must the plaintiff

3    see the injured victim," but also the plaintiff's "observation must cause emotional distress greater than the

4    distress characteristic of learning about the tragic death or injury of a loved one." <u>Id.</u> at 932.

5         Here, plaintiffs claim defendants' actions in arresting Mr. Allen negligently caused them severe

6    emotional distress. Plaintiffs' First Amended Complaint, ¶ 5.  The key elements of the tort of negligent

7    infliction of emotional distress, however, have not been met.  The facts of this case do not show, nor do

8    plaintiffs even claim, that Mr. Allen or any of his family members were physically injured as a result of a

9    traumatic accident, let alone his arrest.  In addition, neither Mr. Allen nor any of the other plaintiffs have

10    demonstrated, or again even alleged, that they experienced emotional distress with objective symptoms as a

11    result of the actions of defendants, even if those actions had resulted in a physical injury.[5]  Accordingly, the

12    Court also finds this claim to be unsupported by the facts of this case.

13    V.     <u>Plaintiff's Claims of Negligent Hiring and Supervision</u>

14         Under Washington law, "[a]n employer may be liable to a third person for the employer's

15    negligence in hiring or retaining a servant who is incompetent or unfit." <u>Peck v. Siau</u>, 65 Wn. App. 285, 288

16    (1992) (citation omitted).  In such cases, "negligence usually consists of hiring or retaining the employee

17    with knowledge of his unfitness, or of failing to use reasonable care to discover it before hiring or retaining

18    him." <u>Peck</u>, 65 Wn. App. at 288.  It is necessary, however, "to establish such negligence as the proximate

19    cause of the damage to the third person," which "requires that the third person must have been injured by

20    some negligent or other wrongful act of the employee so hired." <u>Id.</u>  Thus, an employer will be liable only

21    if: "(1) the employer knew, or in the exercise of ordinary care, should have known that the employee was

22    unfit; and (2) retaining the employee was a proximate cause of the plaintiff's injury." <u>Crisman v. Pierce</u>

23    <u>County Fire Protection Dist. No. 21</u>, 115 Wn. App. 16, 20 (2002)

24         Washington courts also have recognized "[n]egligent supervision of an employee" as a cause of

25    action. <u>Thompson v. Everett Clinic</u>, 71 Wn. App. 548, 555 (1993).  Specifically, "[a]n employer is not

26

27           [5]As discussed in further detail below, furthermore, the "public duty doctrine" as it relates to the scope of defendants' duty

28    to plaintiffs would bar recovery under this claim as well. <u>See</u> <u>Stansfield v. Douglas County</u>, 107 Wn. App. 1, 13-15 (2001) ("Under the public duty doctrine, liability may not be imposed on the State for the negligent conduct of a public official unless the duty breached is owed to a particular individual rather than to the public as a whole.") (citing <u>Atherton Condo. Apartment-Owners Ass'n Bd. v. Blume Dev. Co.</u>, 115 Wn.2d 506, 529 (1990)).

1    liable for negligently supervising an employee whose conduct was outside the scope of the employment

2    unless the employer knew, or in the exercise of reasonable care, should have known the employee presented

3    a risk of danger to others." Id.; see also Niece v. Elmview Group Home, 131 Wn.2d 39, 48 (1997).  The

4    knowledge element thus generally has been interpreted by Washington courts "to require a showing of

5    knowledge of the dangerous tendencies of the particular employee." Niece, 131 Wn.2d at 52; Thompson,

6    71 Wn. App. at 555 (employer may be liable if it had prior knowledge of employee's dangerous tendencies).

7

8         In addition, under Washington law, the state "has a duty to take reasonable precautions to protect

9    against reasonably foreseeable dangers posed by the dangerous propensities of parolees." Taggart v. State,

10   118 Wn.2d 195, 217 (1992); see also Bishop v. Miche, 137 Wn.2d 518, 526 (1999) (duty exists to protect

11   others from harm posed by, and thus to adequately supervise, dangerous probationers).  More specifically,

12   "the state may be liable for the negligence of a parole [or probation] officer who fails to use reasonable care

13   in supervising a parolee [or probationer] whose dangerous propensities pose a reasonable foreseeable

14   danger to others." Hertog v. City of Seattle, 138 Wn.2d 265, 275 (1999).

15        In their complaint, plaintiffs claim the State of Washington "failed to instruct, discipline and train

16   defendant officers in the appropriate technique for avoiding unlawful arrests, inappropriate conduct, and the

17   illegal use of excessive force." Plaintiffs' First Amended Complaint, ¶ 7.  Plaintiffs further claim in their

18   complaint that the state "failed to properly hire, supervise, train, discipline and control police personnel

19   under its command, including the defendant officers, and failed to insure compliance with the laws, rules,

20   and regulations regarding the use of excessive force."[6] Id. at ¶ 8.  It is not clear under which legal theory of

21   negligent supervision plaintiff is basing these two claims.  What is clear, however, is that each such claim

22   fails under either theory, as well as under the legal theory of negligent hiring.

23        First, plaintiffs have not shown that the state either knew or should have known that any of the three

24

25   ───────────────

26        [6]Plaintiffs also claim this failure resulted in a "policy or custom" of inadequate training, supervision and discipline which
     violated the rights, including their own, of those who came into contact with police personnel. Id.  In their response to defendants'

27   motion to dismiss their state law claims, plaintiffs again raise this issue, relying on Monell v. Department of Social Services, 436
     U.S. 658 (1978), Lee v. City of Los Angeles, 250 F.3d 668 (9ᵗʰ Cir. 2001), and McRorie v. Shimoda, 795 F.2d 780 (9ᵗʰ Cir. 1984).

28   As the Court explained in its order dismissing plaintiffs' federal civil rights claims, however, Monell and Lee apply only with
     respect to lawsuits brought against municipalities or other local government entities, and not the state itself.  The Court further
     explained that for other reasons McRorie was inapplicable to this case as well.  As such, the Court dismissed plaintiffs' claim that
     the state's alleged policy or custom of inadequate training, supervision and discipline violated their federal civil rights.

1  defendant officers had prior dangerous tendencies or otherwise presented an unreasonable risk to others,

2  which would be required under the first theory of negligent supervision.  Plaintiffs also have failed to show

3  that defendants were acting outside the scope of their employment when they arrested Mr. Allen.  Rather, it

4  appears they were acting entirely within that scope at the time.  Further, plaintiffs have not shown that the

5  state knew or should have known of defendant officers' unfitness prior to their hire, let alone that defendant

6  officers were unfit to hire in the first place.

7  In addition, the second type of negligent supervision claim would come into play only if plaintiffs

8  could show the dangerous propensities of Mr. Allen himself posed a reasonably foreseeable risk to others,

9  and defendant officers took no reasonable precautions to protect against those propensities.  Plaintiffs do

10  not make such an argument, however, and, indeed, the facts of this case indicate that defendant officers

11  made reasonable efforts to protect the public by acting to arrest Mr. Allen on their reasonable suspicion that

12  he had engaged in activity which violated the conditions of his community supervision.  Accordingly, both

13  of the above negligent supervision claims and negligent hiring claim fail as well.

14  VI.    Plaintiff's Negligence Claim

15  In their response to defendants motion to dismiss their state law claims, plaintiffs argue that even if

16  the Court were to find defendants Feld, Frice and Shaver were protected by qualified immunity with respect

17  to their federal civil rights claims, they still would be liable based on the tort claims of negligence and/or

18  reckless or intentional misconduct.  Defendants argue, however, that even under the state's liberal pleading

19  rules, the complaint cannot be fairly read to include any such claims, and that plaintiffs are now barred from

20  raising these claims as they were not originally contained in the complaint.  The Court agrees plaintiffs have

21  not sufficiently plead a claim of general negligence, and that, even if they had properly done so, it would be

22  barred by the public duty doctrine.  In addition, the Court finds that any claim plaintiffs made with respect

23  to reckless or intentional misconduct, was made only in regard to their claim of outrage, which, as discussed

24  above, is not supported by the facts of this case.

25  Under Washington law, the complaint "must 'apprise the defendant of the nature of the plaintiff's

26  claims and the legal grounds upon which the claims rest.'"  Kirby v. City of Tacoma, 124 Wn. App. 454,

27  469-70 (2004) (citation omitted).  "A pleading is insufficient when it does not give the opposing party fair

28  notice of what the claim is and the ground upon which it rests."  Lewis v. Bell, 45 Wn. App. 192, 197

(1986); Lundberg v. Coleman, 115 Wn. App. 172, 180 (2002) (pleadings are intended to give notice to

court and opponent of general nature of claims asserted).  A defendant "should not be required to guess

against which claims it will have to defend." <u>Kirby</u>, 124 Wn. App. at 470.  Further, "[a] party who does not

plead a cause of action or theory of recovery cannot finesse the issue by later inserting the theory into trial

briefs and contending it was in the case all along." <u>Dewey v. Tacoma School Dist. No. 10</u>, 95 Wn. App. 18,

26 (1999).        The only legal claims contained in plaintiffs' complaint are those included in paragraphs 4

through 9.  Paragraph 4, which shall be discussed below, concerns claims of use of excessive force and false

arrest.  Paragraph 5 does employ the terms "negligently," "recklessly" and "intentionally," but only with

respect to plaintiffs' claims of outrage and negligent infliction of emotional distress.  As discussed above,

these claims are entirely distinct from, and require different standards of proof then, a general claim of

negligence, which merely requires proof of "the existence of a duty to the plaintiff, breach of the duty, and

injury to plaintiff proximately caused by the breach." <u>Hertog</u>, 138 Wn.2d at 275.  Paragraph 6 deals with

plaintiffs' Fourth, Fifth, Eighth and Fourteenth Amendment claims.  Paragraphs 7 and 8, which were dealt

with above, concern plaintiffs' negligent supervision and hiring claims.  Finally, paragraph 9, which also

was dealt with above, concerns plaintiffs' claim of outrage.

Nowhere in any of these claims can a claim of general negligence, let alone reckless or intentional

misconduct, be reasonably gleaned, nor should defendants, let alone the Court, have to guess whether they

include such a claim.  Even if it could be said that such a claim may be fairly read therefrom, either against

defendant officers or the state itself, it would fail.  In Washington, "[t]he threshold determination in any

negligence action is whether the defendant owes a duty of care" to the plaintiff. <u>Torres v. City of Anacortes</u>,

97 Wn. App. 64, 73 (1999).  Under the "public duty" doctrine, however, "there is no liability for a public

official's negligent conduct unless it is shown that 'the duty breached was owed to the injured person as an

individual and was not merely the breach of an obligation owed to the public in general (*i.e.*, a duty to all is

a duty to no one).'" <u>Id.</u> (quoting <u>Taylor v. Stevens County</u>, 111 Wn.2d 159, 163 (1988)); <u>see also</u> <u>Bailey v.</u>

<u>Town of Forks</u>, 108 Wn.2d 262, 265 (1987).

In requiring "a duty toward the particular plaintiff be established," the public duty doctrine serves

"the same end" as the basic negligence principles of duty of care, foreseeability, and relevant public policy.

<u>Bailey</u>, 108 Wn.2d at 266; <u>Torres</u>, 97 Wn. App. at 73. There are "four situations in which a governmental

agency," or its agents, "acquires a special duty of care owed to a particular plaintiff or a limited class of

potential plaintiffs, rather than the general duty of care owed to the public at large." <u>Bailey</u>, 108 Wn.2d at

268. Those situations are as follows:

> (1) when the terms of a legislative enactment evidence an intent to identify and protect a particular and circumscribed class of persons (legislative intent); (2) where governmental agents responsible for enforcing statutory requirements possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and the plaintiff is within the class the statute intended to protect (failure to enforce); (3) when governmental agents fail to exercise reasonable care after assuming a duty to warn or come to the aid of a particular plaintiff (rescue doctrine); or (4) where a relationship exists between the governmental agent and any reasonably foreseeable plaintiff, setting the injured plaintiff off from the general public and the plaintiff relies on explicit assurances given by the agent or assurances inherent in a duty vested in a governmental entity (special relationship).

Id. In addition, Washington courts will not apply the public duty doctrine "where the state engages in a proprietary function," i.e. "when it engages in a business-like venture." Id.; Dorsch v. City of Tacoma, 92 Wn. App. 131, 135 (1998).

Clearly the legislative intent, failure to enforce, rescue doctrine and proprietary function exceptions do not apply here, and plaintiff has made no argument otherwise. Thus, the only exception to the public duty doctrine that could possibly be applicable to the facts of this case would be that involving a "special relationship." Under this exception, as noted above, a plaintiff may establish the presence of "a duty owed to the injured person as an individual" by showing "that a 'special relationship' exists between the plaintiff and the governmental body." Torres, 97 Wn. App. at 73-74. In addition, as with the other exceptions, this "special relationship inquiry" acts as "a 'focusing tool' used to ensure that the duty asserted is specifically focused on the claimant and is not merely a general duty to the public at large." Id. at 74.

As previously noted, in Washington, the state "has a duty to take reasonable precautions to protect against reasonably foreseeable dangers posed by the dangerous propensities of parolees." Taggart, 118 Wn.2d at 217; see also Bishop, 137 Wn.2d at 526 (duty exists to protect others from harm posed by and thus to adequately supervise dangerous probationers). The state therefore "may be liable for the negligence of a parole [or probation] officer who fails to use reasonable care in supervising a parolee [or probationer] whose dangerous propensities pose a reasonable foreseeable danger to others." Hertog, 138 Wn.2d at 275. This is because "community correction officers have special relationships with an adjudicated offender because of the ability to control the offender's behavior." Terrell v. State, 120 Wn. App. 20, 27-28 (2004).

On the other hand, Washington courts recognize that "[t]he relationship of police officers to citizen is too general to create an actionable duty." Id. For example, in responding to a citizen's call for assistance,

"[t]o create a special relationship between police officer and citizen, Washington law requires direct contact setting the citizen apart from the general public, and 'express assurances' of assistance that give rise to a justifiable reliance on the part of the citizen." Id.; see also Terrell, 120 Wn. App. at 29 (to establish special relationship under public duty doctrine, plaintiff must show: (1) direct contact or privity with public official that sets plaintiff apart from general public; (2) public official gave express assurances; and (3) assurances justify plaintiff's reliance).

Given the facts of this case, however, it cannot be said that the special relationship exception applies. First, while defendants, as community corrections officers, had a duty to protect others from the dangerous propensities of Mr. Allen, an offender under their charge who was subject to community supervision, no showing or even allegation has been made he posed a dangerous propensity to, let alone harmed, the other plaintiffs in this case. Second, assuming for purposes of discussion that although under Washington law a special relationship could be said to have existed between Mr. Allen and defendants due to the fact that defendants were community corrections officers, nothing in the record indicates that they gave Mr. Allen or any of the other plaintiffs any express assurances, or, even if they had, that plaintiffs justifiably relied on such assurances.[7]

To the extent plaintiffs are attempting to assert a claim of negligence against the state, furthermore, it is true that in Washington, under the doctrine of *respondeat superior*, or "vicarious liability," an employer may be liable "for the torts of an employee who is acting on the employer's behalf," unless "the employee steps aside from the employer's purposes in order to pursue a personal objective of the employee." Niece, 131 Wn.2d at 425-26; see also Gilliam v. Department of Social and Health Services, 89 Wn. App. 569, 584 (1998) ("When an employee causes injury by acts beyond the scope of employment, an

---

[7]Defendants note in their response to the motion to dismiss that plaintiffs further assert there is a material issue of genuine fact as to whether defendants were negligent in failing to investigate further whether Mr. Allen had violated the conditions of his community supervision prior to arresting him. See Amended Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment Re: State Law Claims, p. 8. As with the more general negligence claim plaintiffs' now are attempting to assert, this claim also cannot be fairly read to originally have been included in the complaint. In addition, "in general, a claim for negligent investigation does not exist under the common law because there is no duty owed to a particular class of persons." Rodriguez v. Perez, 99 Wn. App. 439, 443 (2000). "In the area of law enforcement investigation" itself, the duty owed also is that "typically owed to the public." Id. ("[T]he duty of police officers to investigate crimes is a duty owed to the public at large and is therefore not a proper basis for an individual's negligence claim."). A specific statutory provision may provide "a duty to investigate for the protection of a specified class." Id. at 443-44 (statute which creates governmental duty to protect particular individuals can be basis for negligence action where that statute is violated and injured party is within class of persons designed to be protected). The only such statutory duty to investigate that has been created to date in Washington, however, appears to be limited to "the area of child abuse investigations." Id.; Lesley v. State, 83 Wn. App. 263, 273 (1996).

1   employer may be liable for negligently supervising the employee."). Here, plaintiffs do not allege, and none

2   of the parties appear to dispute the fact that, defendant officers were at all times acting on behalf of the

3   Department of Corrections when they arrested Mr. Allen.

4          Given the above, therefore, if defendant officers were in fact negligent, any negligence on their part

5   will be attributable to their employer, the state, which then "may be held vicariously liable." <u>Rodriguez</u>, 99

6   Wn. App. at 881.  Conversely, if plaintiffs "fail to prove negligence," the state cannot be held liable even if

7   its supervision of defendant officers turned out to be negligent.[8] <u>Id.</u>  Here, such state liability will not apply.

8   As discussed above, because the public duty doctrine would bar plaintiffs' claim of negligence against each

9   of the individual defendant officers, any such claim against the state itself would fail as well.

10  VII.   <u>Plaintiff's Claim of False Arrest and False Imprisonment</u>

11         Defendants argue the claims of false arrest and false imprisonment plaintiffs now assert were not

12  raised in their complaint.  In paragraph 4 of the complaint, however, plaintiffs claim the "apprehension" of

13  Mr. Allen "was made with excessive force, without justification or probable cause."  While plaintiffs did

14  not use the specific terms "false" or "arrest," the Court finds it reasonable to read a claim for false arrest into

15  this statement.  Specifically, it is clear what is meant here is that Mr. Allen was taken into custody by law

16  enforcement officials without probable cause.  On the other hand, the Court does not find this statement

17  gives fair notice to other parties of an intent to raise a claim of false imprisonment, in that plaintiffs merely

18  use the term "apprehension."  Nothing in the use of that term, or the statement of the claim in paragraph 4

19  as a whole, indicates such a claim is being made in addition to one for false arrest.

20         In any event, whether plaintiffs were raising a claim for both false arrest and false imprisonment or

21  merely a claim for false arrest, the Court finds that in either case such a claim must fail.  In Washington, the

22  existence of "probable cause is a complete defense to an action for false arrest and imprisonment." <u>Hanson</u>

23  <u>v. City of Snohomish</u>, 121 Wn.2d 552, 564 (1993).   As discussed above, the Court already has found that

24  defendant officers had "reasonable cause" for arresting Mr. Allen, which is sufficient to conduct a search

25  and seizure of a parolee, probationer or offender subject to community supervision under Washington law.

26  <u>See</u> RCW 9.94A.631; RCW 9.94A.740(1); <u>Massey</u>, 81 Wn. App. at 200 (search and seizure reasonable

27

28

_____

   [8]As discussed above, the Court found plaintiffs' claims that the state was negligent in supervising or hiring defendants
Feld, Frice and Shaver to be without merit.

1   where law enforcement official has well-founded suspicion violation has occurred); <u>Lucas</u>, 56 Wn. App. at

2   243 (well-founded suspicion of violation, rather than probable cause, required to conduct warrantless search

3   of probationer or convicted defendant released on conditions of supervision).  Accordingly, the presence of

4   reasonable cause in this case bars any claim of false arrest or false imprisonment.

5                                                    <u>CONCLUSION</u>

6          For the reasons discussed above, defendants have met their burden of demonstrating that they are

7   entitled to judgment as a matter of law on all of plaintiffs' state law claims.  Therefore, defendants' motion

8   for summary judgment on those claims (Dkt. #41) hereby is GRANTED, and plaintiffs' state law claims

9   hereby are DISMISSED.  In addition, because, as noted above, the Court already has dismissed plaintiffs'

10  federal civil rights claims brought pursuant to 42 U.S.C. § 1983, no claims remain in this case.  Plaintiffs'

11  first amended complaint (Dkt. #29), accordingly, hereby is DISMISSED as well.

12         DATED this 27th day of November, 2006.

13

14

15                                                          Karen L. Strombom
                                                           United States Magistrate Judge
16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page - 23